UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KIMBERLY L. KILLEBREW,<br>Individually and on behalf of others<br>similarly situated, | ) ) ) | Case No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| VOLKSWAGEN GROUP OF AMERICA,<br>INC., A New Jersey Corporation. | ) ) ) | |
| Defendant. | ) ) | |

Plaintiff Kimberly L. Killebrew ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), alleges the following:

## I. INTRODUCTION

1. On September 21, 2015, Michael Horn, CEO of Defendant Volkswagen Group of America, Inc., ("Volkswagen") publicly admitted that "*Volkswagen has broken the trust of our customers, and the public here in America*."[1] Mr. Horn further publicly admitted on behalf of Volkswagen: "*So let's be clear about this: our company was dishonest with the [Environmental Protection Agency ["EPA"] and the California Air Resources Board, and with all of you*," Mr. Horn continued.[2] "*And in my German words, we've totally screwed up. We must fix those cars, and*

---

[1] *See* Autoweek, "Volkswagen US CEO on diesel emissions fiasco: 'We totally screwed up'", September 22, 2015, available at http://autoweek.com/article/car-news/volkswagen-us-ceo-our-company-was-dishonest (last accessed October 8, 2015).
[2] *Id.*

*prevent this from ever happening again, and we have to make things right—with the government, the public, our customers, our employees, and also very importantly our dealers.*" [3]

2.      Likewise, in prepared remarks delivered to the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations on October 8, 2015, Mr. Horn explicitly acknowledged "Volkswagen's use of a software program that served to defeat the regular emissions testing regime."[4]

3.      Moreover, in his October 8, 2015 remarks, Mr. Horn admitted that "On September 3, 2015, Volkswagen AG disclosed at a meeting with the California Air Resources Board ("CARB") and the U.S. Environmental Protection Agency ("EPA") that emissions software in four cylinder diesel vehicles from model years 2009-2015 contained a "defeat device" in the form of hidden software that could recognize whether a vehicle was being operated in a test laboratory or on the road. The software made those emit higher levels of nitrogen oxides when the vehicles were driven in actual road use than during laboratory testing."[5]

4.      As admitted by Mr. Horn, Volkswagen "screwed up" by intentionally and deceptively installing computer software and "defeat devices" that work by switching on the full emissions control systems in Volkswagen's cars only when the car is undergoing periodic emissions testing and only when the vehicles' front wheels are turning. The use of the defeat device was an attempt by Volkswagen to falsely show compliance with state and federal emissions regulations without reducing the vehicles' performance or limiting their acceleration, torque, and fuel efficiency.

---

[3] *Id.*
[4] Testimony of Michael Horn, President and CEO of Volkswagen Group of America, Inc. Before the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations, October 8, 2015, available at http://docs.house.gov/meetings/IF/IF02/20151008/104046/HHRG-114-IF02-Wstate-HornM-20151008.pdf (last accessed October 8, 2015).
[5] *Id.*

5.     For over six years, Volkswagen has intentionally and systematically deceived and cheated its customers, lied to the government, and misled the public about the efficacy of its four cylinder diesel-engine vehicles sold under the Volkswagen and Audi brands. Volkswagen has marketed its so-called "clean diesel" vehicles as high performing, fuel efficient, and environmentally-friendly. In truth, Volkswagen's clean diesel vehicles are anything but clean.

6.     Instead, the Affected Vehicles, defined below, emit noxious pollutants at up to 40 times the legal limit allowed under federal and state law. In order to conceal this inconvenient truth from regulators and the public, Volkswagen installed a sophisticated software algorithm, or "defeat device," in the Affected Vehicles that instructs them to cheat on emissions tests; that is, to engage full emissions controls only when undergoing official emissions testing.  At all other times, the emissions controls are de-activated, and the vehicles emit extremely high, and illegal, levels of pollutants. "Truth in Engineering" is Audi's official slogan.  Ironically, these Audis (and Volkswagens) were engineered to deceive.

7.     To hide this, the computer software and defeat devices used by Defendant Volkswagen disable the emissions control systems in the car once the car has completed its emissions test. While that might have made the cars more fun to drive, it resulted in Volkswagen's cars sending up to 40 times as much pollution into the environment as is allowed under the Clean Air Act and state regulations, such as those issued by CARB.

8.     As of September 21, 2015, The New York Times reported that while it is possible to lower the levels of nitrogen oxide ("NOx") emitted by diesel engines, the software Volkswagen installed instead:

> "[S]idestepped this trade-off by giving a misleadingly low nitrogen- oxide reading during [standard emissions] tests. The software measured factors like the position

3

of the steering wheel, the vehicle's speed and even barometric pressure to sense when the car was being tested…."[6]

9.      Volkswagen has admitted that approximately 11 million vehicles worldwide are affected by its deception. Volkswagen's stock gas plummeted and it reportedly is "setting aside the equivalent of half a year's profits—6.5 billion euros, or about $7.3 billion" in a preemptive maneuver to downplay public scrutiny. In a statement issued on September 18, 2015, by the Executive Committee of Volkswagen AG's Supervisory Board, the Committee confessed that it "recognizes…the economic damage caused [by the manipulation of the emissions data.]"[7]

10.     This case arises because Volkswagen purposefully and intentionally breached the laws of the United States and the rules and regulations of various states and the EPA by selling in the United States Volkswagen and Audi vehicles that purposefully evaded federal and state laws. As stated by Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA: "*Using a defeat device in cars to evade clean air standards is illegal and a threat to public health.*"[8] Yet that is exactly what Volkswagen did in its 2009-2015 Volkswagen and Audi Clean Diesel vehicles.

11.     Volkswagen's violations are explained in EPA's September 18, 2015 Notice of Violation ("NOV"), as well as a letter from the California Air Resources Board ("CARB").

12.     As detailed in the EPA's NOV, sophisticated software in the Volkswagen and Audi diesel vehicles sold by Volkswagen in the United States detects when the vehicle is undergoing official emissions testing and enables full emissions controls during the test. But otherwise, at all

---

[6] *See* New York Times, "Volkswagen Stock Falls as Automaker Tries to Contain Fallout," by Jack Ewing, September 21, 2015, available at  http://www.nytimes.com/2015/09/22/business/international/volkswagen-shares-recall.html (last accessed October 8, 2015).
[7] *See* Edmunds, "Volkswagen CEO Resigns in Wake of Diesel Emissions Scandal," by Anita Lienert, September 23, 2015, available at http://www.edmunds.com/car-news/volkswagen-ceo-resigns-in-wake-of-diesel-emissions-scandal.html (last accessed October 8, 2015).
[8] *See* Sept. 18, 2015 EPA News Release.

other times that the vehicle is running, the emissions controls are disabled. This results in cars that meet emissions standards in the laboratory or testing station, but during normal operation emit NOx at up to 40 times the standard allowed under federal and state laws and regulations. The software algorithm used by Volkswagen to switch from one mode to the other is a defeat device as defined by the Clean Air Act.

13.     Volkswagen has admitted that the "defeat device" was present in approximately 482,000 Affected Vehicles sold in the United States, and more than 11 million vehicles worldwide.

14.     By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than what was certified to EPA, and higher levels than state and federal regulations allow, Volkswagen violated the Clean Air Act and state regulations, defrauded its customers, and engaged in unfair competition under state and federal law.

15.     As used in this Complaint, the "Affected Vehicles" refer to Volkswagen and Audi vehicles identified in the EPA's NOV sold in the United States with four cylinder, Type EA 189 and EA 288 diesel engines, which share a common, uniform, deceitful, and harmful design, in that they (A) emit high and illegal levels of pollutants in normal operation; (B) are equipped with a defeat device enabling them to bypass emissions regulations; and (C) cannot deliver the advertised combination of low emissions, fuel economy, and high performance for which they were marketed and advertised.  The Affected Vehicles include at least the following makes and model years:

- 2009 – 2015 Volkswagen Jetta TDI

- 2009 – 2014 Volkswagen Jetta SportWagen TDI

- 2009 – 2015 Volkswagen Jetta TDI;

- 2009 – 2014 Volkswagen Jetta SportWagen TDI;

- 2012 – 2015 Volkswagen Beetle  TDI;

- 2012 – 2015 Volkswagen Beetle Convertible TDI;

- 2010 – 2015 Volkswagen Golf TDI;

- 2015 Volkswagen Golf SportWagen TDI;

- 2012 – 2015 Volkswagen Passat TDI; and

- 2010 – 2015 Audi A3 TDI.

16. Plaintiff is among those who were deceived and cheated by Volkswagen and who purchased and/or leased an Affected Vehicle based on Volkswagen's misrepresentations and omissions.

17. Plaintiff Killebrew brings this action individually, and on behalf of a Class of all persons similarly situated in the United States who purchased or leased an Affected Vehicle, and on behalf of a Subclass of Georgia a residents who purchased or leased an Affected Vehicle (the "Class Members").

18. Plaintiff seeks the return of the premium paid for a Clean Diesel vehicle over the cost of the same model and trim of car with a gasoline engine; restitution of the purchase price of the Affected Vehicles should any "fix" installed by Volkswagen result in a degradation of performance and/or fuel efficiency; compensation for any additional sums spent on fuel or maintenance as a result of any "fix"; restitution for purchase of extended warranties that will go unused; and a lump sum for remediation of the environmental damage Plaintiff and the Class unwittingly contributed to by driving cars that they believed were clean, but were in fact in violation of state and EPA regulations and the Clean Air Act.

## II.    PARTIES

### A.    Plaintiff

19.    Plaintiff Kimberly L. Killebrew is a citizen of and domiciliary of the State of Georgia residing in the Atlanta, Fulton County, Georgia.  In August 2013, Plaintiff Killebrew purchased a 2010 Volkswagen Jetta TDI from an authorized Volkswagen dealer in Atlanta, Georgia.  Plaintiff Killebrew still owns her Affected Vehicle. Unknown to Plaintiff Killebrew, at the time the vehicle was purchased, it was equipped with an emission control "defeat device" which caused the vehicle to get an undue EPA certification and pass emissions tests, but at all other times emits up to 40 times the allowed level of pollutants, including NOx.  The use of the "defeat device" by Volkswagen has caused Plaintiff Killebrew out-of-pocket loss, future attempted repairs, and diminished value of her vehicle.  Volkswagen knew about and purposefully used the "defeat device," but did not disclose the "defeat device" and its effects to Plaintiff Killebrew, so Plaintiff Killebrew purchased the vehicle on the reasonable, but mistaken, belief that her vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

### B.    Defendant

20.    Defendant Volkswagen Group of America, Inc., is a corporation doing business in all 50 states (including the District of Columbia) and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. Defendant Volkswagen Group of America, Inc. is registered to conduct business in State of Georgia with the Georgia Corporations Division. Defendant Volkswagen Group of America, Inc. also conducts certain operations under name Audi of America, Inc., which it has registered as a fictitious name with the Secretary of State for the Commonwealth of Virginia.

21.     At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the Affected Vehicles under the Volkswagen and Audi brand names throughout the United States. Volkswagen and/or its and/or its agents, contractors and suppliers designed, manufactured, and installed the Clean Diesel engine systems in the Affected Vehicles, which included the "defeat device."  Volkswagen also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

## III.   JURISDICTION

22.     Jurisdiction arises under 28 U.S.C. § 1331 based upon the federal RICO claims pursuant to 18 U.S.C. § 1961 *et seq.* and there is supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.  Jurisdiction is also proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiff and many members of the proposed Plaintiff Class are citizens and domiciliaries of states different from Volkswagen's home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

23.     This Court has personal jurisdiction over Defendant Volkswagen Group of America, Inc. under O.C.G.A. § 9-10-91 because it conducts business in Georgia, has committed a tortious act or omission within Georgia, has caused a tortious injury in within Georgia and has sufficient minimum contacts with Georgia.

**VENUE**

24.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**IV.    FACTUAL BACKGROUND**

25.    This case arises from Volkswagen's unprecedented, and until recently successful, efforts to deceive and cheat consumers, deceive the public, as well as to knowingly and intentionally violate and attempt to bypass federal and state regulations.

      **A.    Volkswagen Marketed the Affected Vehicles As Possessing Eco-Friendly, Fuel Efficient Diesel Engines.**

26.    Diesel vehicles are generally more fuel efficient and powerful than gasoline engines.  Diesel engines, however, emit higher levels of certain pollutants as a by-product of combustion.

27.    Volkswagen, in the face of continued improved governmental regulations to address a cleaner environment, attempted to address this problem with its so-called "clean diesel" vehicles.  In an effort to make the Affected Vehicles more marketable and induce consumers to pay premium prices, Volkswagen claimed its clean diesel TDI (turbocharged direct injection) engines combined fuel efficiency and high performance with low emissions.  The combination of these three characteristics was the primary selling point for the Affected Vehicles and was the centerpiece of Volkswagen's advertising efforts.

28.    Volkswagen expressly marketed and advertised its Clean Diesel models as extraordinarily clean, EPA certified in all 50 states, and powerful.

29.    Volkswagen broadly boasted about the performance and environmental cleanliness of its engine systems. In an October 2008 press release, Volkswagen bragged:

> The Jetta TDI is amongst the ten most fuel efficient vehicles on the US market. In the recently published "Fuel Economy Guide 2009" the EPA (Environmental Protection Agency) listed the Jetta TDI in the top ten low consumption and low emissions vehicles. In the current edition of the publication, the Jetta 2.0 l Clean TDI, introduced to the market two months ago, is praised particularly for its excellent consumption figures - it has a fuel consumption of 5.7 litre per 100 kilometre. Moreover, the Jetta Clean TDI also fulfils stringent Californian emission standards. This was achieved through modifications within the engine and by

implementing an exhaust treatment system developed especially by Volkswagen and which reduces nitrogen oxide emission (NOx) by up to 90 percent. The central element of the exhaust treatment system is the NOx storage catalytic converter.[9]

30.     Since introducing the 2.0L TDI Clean Diesel engine in 2008, Volkswagen have touted it as a "*fantastic power train*" that "*gives very good fuel economy*" and "*is also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would . . . cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95% . . . [and is] clean enough to be certified in all 50 states.*"[10]

31.     The TDI Clean Diesel engines are turbocharged and directly inject fuel into each cylinder via fuel injectors. Volkswagen have stated, "[t]he superior qualities of the 2.0 Liter TDI engine with common rail injection systems are oriented towards future challenges in acoustics, comfort, and exhaust gas after-treatment . . . confirming Volkswagen's role as a pioneer in diesel technology."

32.     Volkswagen also claimed that TDI Clean Diesel models "*typically have a higher resale value versus comparable gasoline vehicles*."

33.     Volkswagen advertising, which keyed on the unique combination of clean, efficient and highly performing, was very effective. In fact, Volkswagen has become the largest manufacturer and seller of light duty diesel passenger vehicles in the United States.

34.     Some advertisements, for example, specifically emphasized the low emissions and eco-friendliness of the vehicles:

---

[9] *See* http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2008/
10/vw_in_fuel_economy_guide.html (last accessed Sept. 23, 2015) (emphasis added).
[10] Statement of Volkswagen Group of America, Inc.'s Chief Operating Officer Mark Barnes, to The Business Insider, October 9, 2009.





35.     Others touted the combination of fuel efficiency and power:



36. Yet others addressed the full package, implying that in contrast to the "stinky, smoky, and sluggish" diesel vehicles of old, Volkswagen's new diesel vehicles were clean, efficient, and powerful all at once:



37. The foregoing print advertisements were distributed via the United States mail and via the internet, a means of interstate and international wire communications.

38. Volkswagen also ran similar advertisements on television and on the Internet.[11]

39. Volkswagen's efforts were a resounding success, as Volkswagens and Audis became the highest-selling diesel passenger cars in the United States.

40. Volkswagen doubled-down on "clean" and "green" vehicles. Being highly efficient, fun, and "clean" are the central messages for Volkswagen's diesel engine campaign.

41. Volkswagen also touted the performance characteristics of the TDI Clean Diesel, claiming that clean emission technology did not sacrifice its 236 lbs/ft of torque and turbocharged Clean Diesel engine. In a recent 2015 Volkswagen Golf sales brochure, Volkswagen stated "With the 2.0L TDI engine, you'll appreciate every fuel- efficient mile with the EPA-estimated 45 hwy mpg. But that's only half the story. Step on the pedal and feel the 236 lb-ft of torque and let the performance tell the other half."

42. Volkswagen continued its aggressive campaign to dupe its customers into believing their cars were clean and environmentally friendly. In advertisements appearing on its webpage as recent as September 21, 2015, Volkswagen extended the deceit. These ads are only now being stripped from Volkswagen's websites and other sites such as Youtube.com.

---

[11] An example of a commercial touting how "clean" Volkswagen diesels is available at https://www.youtube.com/watch?v=WNS2nvkjARk (last visited September 22, 2015). Examples of commercials touting the fuel efficiency of Volkswagen diesels are available at https://www.youtube.com/watch?v=a2CNHVXvNRo and https://www.youtube.com/watch?v=wj3if2gRWYE (last visited September 22, 2015). An example of a commercial touting the performance of Volkswagen diesels is available at https://www.youtube.com/watch?v=0VA51xWXZ3g  (last visited September 22, 2015).



43.     Volkswagen's now dubious concern for the environment extended beyond its Clean Diesel campaigns. On the "Environment" page of its website, Volkswagen claims that they takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives."

44.     Volkswagen trumpeted its apparent environmental bona fides when the Audi A3 TDI and Volkswagen Jetta TDI were named the 2010 Green Car of the Year and the 2009 Green Car of the Year. Ironically, a key feature of the most recent Clean Diesel advertisements was "Promise kept."[12]

45.      On the Volkswagen Clean Diesel webpage, it continued to mislead consumers, touting the supposedly reduced greenhouse gas emission of the Clean Diesel engine system.[13]

46.     On   its   website   to   promote   its   "clean"   diesel   technology, www.clearlybetterdiesel.org, Volkswagen falsely claimed that its Clean Diesel engine system

---

[12] See http://www.vw.com/features/clean-diesel/ (last visited Sept. 21, 2015). The content has since been removed.
[13] See http://www.audiusa.com/technology/efficiency/tdi?csref=116751439289858719 (last visited Sept. 21, 2015). The content has since been removed.

reduces smog and "meets the highest standards in all 50 states, thanks to ultralow sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner."

**B.     Volkswagen Deliberately Concealed The Excessive, Unlawful Emission Levels.**

47.     For years, Volkswagen failed to disclose to the public and to consumers the presence of the defeat devices in the Affected Vehicles and the true nature of its Affected Vehicles' performance and emissions.

48.     The Clean Air Act, enacted in 1970, is a comprehensive federal law that regulates air emissions from stationary and mobile sources. 42 U.S.C. § 7401, et seq. Congress determined that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." CAA § 101(a)(2), 42 U.S.C. § 7401(a)(2). The Clean Air Act and the regulations under it, as well as state regulations, were passed and are intended to reduce the emission of NOx and other pollutants, thereby protecting human health and the environment.

49.     As noted in the EPA's official press release, NOx is dangerous:

> NOx pollution contributes to nitrogen dioxide, ground-level ozone, and fine particulate matter. Exposure to these pollutants has been linked with a range of serious health effects, including increased asthma attacks and other respiratory illnesses that can be serious enough to send people to the hospital. Exposure to ozone and particulate matter have also been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory disease are particularly at risk for health effects of these pollutants.[14]

50.     The Clean Air Act requires car makers to certify that vehicles sold in the United States meet federal emissions standards. The EPA certifies conformity with regulations to car

---

[14] See 2015 Press Releases, EPA, *EPA, California Notify Volkswagen of Clean Air Act Violations*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, (September 18, 2015), http://yosemite.epa.gov/opa/admpress.nsf/21b8983ffa5d0e4685257dd4006b85e2/dfc8e33b5ab162b985257ec40057813b!OpenDocument.  Plaintiff request that the Court take judicial notice of these public admissions under Fed. R. Evid. 201.

makers for vehicles that satisfy emissions regulations. To be sold in the United States, a vehicle must be certified by the EPA to comply with its regulations.

51.     The Clean Air Act has strict emissions standards for vehicles and it requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emissions standards to control air pollution.  Every vehicle sold in the United States must be covered by an EPA issued certificate of conformity.

52.     The Clean Air Act makes it a violation for "any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."

53.     The Clean Air Act defines a "defeat device" as one "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation use." When a defeat device is in place, it can bypass, defeat, or render inoperative elements of the vehicle's emission control system that are put in place to ensure compliance with the Clean Air Act. Motor vehicles that are equipped with defeat devices cannot be certified by the EPA.

54.     Under federal law, cars equipped with defeat devices, which reduce the effectiveness of the emissions control system during normal driving conditions, cannot be certified. EPA, *Advisory Circular Number 24*: *Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972); *see also* 40 C.F.R. §§ 86.1809-01, 86-1809, 86-1809-12.

55.    As detailed in the EPA's NOV, sophisticated software in the Volkswagen and Audi diesel vehicles sold by Defendant Volkswagen in the United States detects when the vehicle is undergoing official emissions testing and enables full emissions controls on only during the test and it detects that only the front wheels are turning.  But otherwise, that is at all other times that the vehicle is running, the emissions controls are disabled. This results in cars that meet emissions standards in the laboratory or state testing station, but during normal operation emit NOx at up to 40 times the standard allowed under United States laws and regulations.

56.    The EPA's investigation of Volkswagen was prompted by a May 15, 2014, publication titled "In-Use Emissions Testing of Light-Duty Diesel Vehicles in the United States" by the Center for Alternative Fuels, Engines & Emissions ("CAFEE") of West Virginia University ("the CAFEE Report").

57.    The International Council of Clean Transportation ("ICCT") hired CAFEE to conduct in-use testing of three light-duty diesel vehicles. According to the CAFEE Report, in the tested vehicles "real-world NOx emissions were found to exceed the US-EPA ... standard by a factor[s] of 5 to 35."

58.    The findings of the study were brought to the attention of the EPA and in the same month as the report was published the U.S. EPA and the California Air Resources Board ("CARB") opened a joint investigation into the findings but it was not publicized.

59.    In his October 8, 2015 prepared testimony before the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations, Mr. Horn asserted:

> In the spring of 2014 when the West Virginia University study was published, I was told that there was a possible emissions non-compliance that could be remedied. I was informed that EPA regulations included various penalties for non-compliance with the emissions standards and that the agencies can conduct engineering tests which could include "defeat device" testing or analysis. I was also informed that the company engineers would work with the agencies to resolve the

issue. Later in 2014, I was informed that the technical teams had a specific plan for remedies to bring the vehicles into compliance and that they were engaged with the agencies about the process.[15]

60.     As part of the investigation discussions took place with the Volkswagen on the reasons behind these high NOx emissions observed on its 2.0 liter diesel vehicles over real world driving conditions. Based on these discussions Volkswagen initiated testing to replicate the ICCT/WVU testing and identify the technical reasons for the high on-road emissions.

61.     Volkswagen shared the results of this testing and a proposed recalibration fix for the Gen1 (Lean NOx Trap technology) and Gen2 (Selective Catalytic Reduction (SCR) technology) with CARB staff on December 2, 2014. Based on this meeting, CARB and EPA at that time agreed that Volkswagen could implement the software recall; however, CARB cautioned Volkswagen that if our confirmatory testing showed that the fix did not address the on-road NOx issues, they would have to conduct another recall.

---

[15] Testimony of Michael Horn, President and CEO of Volkswagen Group of America, Inc. Before the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations, October 8, 2015, available at http://docs.house.gov/meetings/IF/IF02/20151008/104046/HHRG-114-IF02-Wstate-HornM-20151008.pdf (last accessed October 8, 2015).





62.     Based on this meeting, Volkswagen initiated a voluntary recall on December 16, 2014 which, according to Volkswagen, affected approximately 500,000 vehicles in the United States. The recall affected all 2009 to 2014 model-year diesel fueled vehicles equipped with Gen1 and Gen2 technology. This recall was claimed to have fixed among other things, the increased real world driving NOx issue.

63.     Interestingly enough the recall's primary objective as stated in the notice was not emissions related but rather involving premature turbocharger failure - "Some vehicle may experience exhaust turbocharger failure (under extreme cold weather conditions) in a brief time period after initial vehicle start up." The emissions aspect of the notice was placed in an "In addition…" paragraph and was still misleading as to the reason for the recall.



64.     Volkswagen made a second attempt to fix the problem beginning in April 2015, when it issued VW Action Code 2306, which was a recall for Clean Diesel equipped vehicles. Volkswagen claimed that the recall was a "repair" and that it "improved" the engine management system. But many owners recorded a marked decrease in fuel efficiency and performance after the recall was completed.



65. Likewise, in its notice of Emissions Service Action 2306, which was sent through the United States Mail to owners of the Affected Vehicles, Volkswagen falsely asserted that it:

(1) Had "an ongoing commitment to [the] environment;"

(2) That it was "cooperat[ing] with the United States Environmental Protection Agency and the California Air Resources Board;' and

(3) That the notice's recipients' "vehicle's engine management software has been proved to assure your vehicles tailpipe emissions are optimized and operating efficiently."

66.     On May 6, 2015 CARB commenced confirmatory testing to determine the efficacy of the recall on both the Gen1 and Gen2 vehicles. CARB confirmatory testing was completed on a 2012 model-year Gen2 Volkswagen test group CVWX02.0U4S, to be followed with Gen1 testing.

67.     CARB staff tested this vehicle on required certification cycles (FTP, US06 and HWFET) and over-the-road using a Portable Emission Measurement Systems (PEMS). On some certification cycles, the recall calibration resulted in the vehicle failing the NOx standard. Over-the-road PEMS testing showed that the recall calibration did reduce the emissions to some degree but NOx emissions were still significantly higher than expected.

68.     The real world effects these two failed two attempted fixes on vehicle performance, especially fuel economy, were not reported by Volkswagen This can be seen on most any forum or blog involving TDI owners as demonstrated below:

- 2014 Passat TDI. Had the update at 10 K miles. Before the update, we averaged 38-38.5 in mixed driving. After the update, we saw a severe drop in the economy from 37-38.5 miles/gallon average to 28-29 miles gallon, mixed driving, in Florida. The car didn't have any issues before or after update, everything seems to work fine, just the fuel consumption became unacceptable. [16]

- So I want to add my story. I had this update installed at 70k mile back in July 2015. I brought it in on an empty diesel take and refilled right after picking up my car from service. Prior to service and having the ecu update install I was getting and average of 42mpg, a range of 750 or so miles. Immediately after update on the next refuel I was getting 36mpg, or actually lower with a range of 550-600 miles on each tank. My driving distance remained the same, my driving behavior remained the same and the only difference done was that ecu update. So now I am refueling more frequently than before which is costing me than before this update. [17]

- Did the California version 23N5 tune that came out with notifications for California residents in February of 2014, a couple of months after everyone else with 2012-2014's got their notices.[18]

---

[16] *See* http://www.myturbodiesel.com/threads/emmisions-service-action-23n5-ecm-software-2012-2014-2-0l-tdi.27419/page-2 (last accessed October 2, 2015).
[17] *Id.*
[18] *Id.*

- Since we don't have cold weather start ups in Southern California, the turbo vanes boost reduction is unchanged, I can see it on my Scan Gauge II even at 35F morning startups... unchanged.[19]

- What has changed is the amount of regenerations, and frequency. They have doubled.... I can barely make it 180 to 200 miles between active regenerations, versus 370 to 400 miles between regenerations before the VW shop visit tune. VW has certainly retarded the timing to reduce NOX, and in the process, it doubles the soot load, and halves the time between fuel being wasted for regenerations. More fuel is being wasted also, on these regenerations. It's all noted if you program your Scan Gauge II in the " X gauges" section. I know this to be true, and factual, as I always reset my trip odometer in the dash when a regeneration was completed. YMMV, but I can guarantee the next tune will be more of the same, more timing reduction to lower combustion temperatures, and NOX, at the expense of even more frequent DPF regenerations, more soot being created and burned off, and more DEF consumption. CARB shared its test results with VW on July 8, 2015. CARB also shared its results with the EPA. Several technical meetings with VW followed where VW disclosed that Gen1, Gen2 and the 2015 model-year improved SCR vehicle (known as the Gen3) had a second calibration intended to run only during certification testing.[20]

69.     The findings in the ICCT/CAFEE investigation led the EPA to continue its own investigation, which ultimately revealed that, contrary to Volkswagen's vigorous efforts to promote themselves as "green" enterprise with an extraordinary commitment to environmental protection, it was instead a liar and a cheat—its Clean Diesel technology was a fraud and its cars were gross polluters that were, in fact, not even legal to drive on U.S. roadways.

70.     The EPA's NOV explained that the installed sophisticated software in Affected Vehicles sold by Defendant Volkswagen in the United States detects when the vehicle is undergoing official emissions testing and turns full emissions controls on only during the test. At all other times that the vehicle is running, however, the emissions controls are deactivated, meaning that pollution is freely released into the environment at levels that exceed those allowed by federal and state laws and regulations. The manner in which the software was programmed by

---

[19] *Id.*
[20] *Id.*

Volkswagen, its agents, affiliates and suppliers falls under the legal description of a defeat device, which is prohibited by the Clean Air Act.

71.     Because modern cars include sophisticated computers and sensors throughout the car, modern emissions testing uses the car's own sensors and computer controls to measure the presence of pollutants and track compliance with EPA and state emissions standards. Emissions testing stations plug a diagnostic device into the car's on-board diagnostics ("OBD II") port and use the exhaust sensors installed in the car to measure the substances emitted. Some states, instead of or in addition to an OBD II diagnostic device, use a probe inserted into the exhaust pipe to measure emissions.

72.     Volkswagen's defeat device used software and sophisticated algorithms to detect when the cars were undergoing emissions testing, and only then fully engaged pollution suppression systems to ensure that emissions complied with regulatory standards. When the car was not being emissions tested—that is, under all other operating conditions—the electronic engine control systems operated the vehicle with no regard for regulatory emissions restrictions but rather for performance and fuel economy.

73.     The result is that Volkswagen's Clean Diesel vehicles would meet emissions standards in labs or testing stations, but at all other times emit NOx at up to 40 times the standard allowed under United States laws and regulations.



**Figure 4.3: Average NOx emissions of test vehicles over the five test routes compared to US-EPA Tier2-Bin5 emissions standard; repeat test variation intervals are presented as ±1σ; Route 1 for Vehicle A includes rush-hour/non rush-hour driving, 'R' designates routes including a test with DPF regeneration event, 'nd' - no data available**

74.    As the journal Popular Mechanics reported, non-Volkswagen diesels commonly use urea injection to "neutralize" NOx emission, but those systems add weight and complexity to the engine. "Everyone wondered how VW met emissions standards while foregoing urea injection. As it turns out, they didn't. It wasn't magical German engineering. Just plain old fraud."[21]

75.    Remarkably, Volkswagen has done this multiple times in the past. As reported in USA Today and the Los Angeles Times, Volkswagen was accused of using a defeat device to pass emissions standards in vehicles it made in 1972-73. While Volkswagen denied wrongdoing, it paid a $120,000 fine in 1974 in order to settle charges that "it gamed pollution control systems in four models by changing carburetor settings and shutting off an emissions-control system at low

---

[21] *See* Popular Mechanics, "This VW Diesel Scandal Is Much Worse Than a Recall," by Eza Dyer, September 21, 2015, available at http://www.popularmechanics.com/cars/a17430/ezra-dyer-volkswagen-diesel-controversy/ (last accessed October 8, 2015).

temperatures."[22] Volkswagen also agreed to install corporate controls to prevent a future similar occurrence. Apparently those controls were not effective.

76.     Then in January of 2004 Volkswagen paid a $552,500 settlement for distributing and selling vehicles in California that were not certified to meet state automobile emissions standards. The settlement stems from Volkswagen delivering to California retail locations 85 new 2002 model year vehicles that were not certified by CARB for sale in California and ultimately selling 84 of those before the error was discovered.[23]

77.     And finally in 2005 Volkswagen was fined 1.1 million for Clean Air Violations, the largest civil penalty ever assessed, to resolve its failure to promptly notify and correct a defective oxygen sensor affecting at least 326,000 of its 1999, 2000 and 2001 Golfs, Jetta and New Beetles. Volkswagen received numerous warranty claims associated with cracked oxygen sensors during the winter of 1999-2000, but did not report the defect to the EPA until June 2001 while the EPA had already discovered the excess emissions from a randomly selected vehicle during a routine test.[24]

78.     Here, Volkswagen has also violated the Clean Air Act by falsely certifying to the EPA that the Affected Vehicles would meet applicable federal emission standards to obtain the EPA-issued Certificate of Conformity, which is required to sell vehicles in the United States.

---

[22] See Los Angeles Times, "U.S. taxpayers duped into shelling out $51 million in green subsidies for 'clean' VW vehicles," by Jerry Hirsch, September 21, 2015, available at http://www.latimes.com/business/autos/la-fi-vw-subsidies-20150922-story.html (last accessed October 8, 2015).
[23] See "CARB Reaches Settlement With Volkswagen," available at http://www.thefreelibrary.com/CARB+Reaches+Settlement+With+Volkswagen.-a0112739241 (last accessed October 8, 2015).
[24] See EPA Press Release, "Volkswagen of America, Inc., Agrees to Pay More Than $1 Million for Clean Air Act Violation," June 15m 2015, available at http://yosemite.epa.gov/opa/admpress.nsf/b1ab9f485b098972852562e7004dc686/6946eeaadcfa982b852570210077 7c0e!opendocument (last accessed October 8, 2015).

79.     The software produced and used by Volkswagen is a "defeat device" as defined by the Clean Air Act and the EPA under 40 C.F.R. §86.1803-01.

80.     The Engine Control Unit, or ECU, and engine management software residing within are designed and manufactured by Robert Bosch GmbH ("Bosch"), a German multinational engineering and electronics company. In addition to the ECU, Bosch supplies other key components, such as the high pressure pump, low pressure exhaust gas recirculation pressure sensors, cam sensors, lambda sensors, hot film air mass sensor, and glow timing electronic control unit. The engine management software is equipped with a feature that is commonly referred to as a Dyno mode or Test mode.

81.     When emissions system and fuel economy and other similar testing is conducted during vehicle development the vehicle is placed on a dynamometer which can be thought of as two big rollers or a treadmill—rather than driving on the road. The vehicle has only its driving wheels rolling (the front ones, in the case of Volkswagen's vehicles). But the rear tires are stationary. The vehicle could otherwise interpret the test procedure as a dangerous situation or malfunction, activating traction control or stability control so instead during these developmental tests the engine management software is placed into Dyno mode. By enabling the Dyno or Test Mode, the vehicle is able to operate during the test process.



82.     Volkswagen has used this feature of the software to serve as a "switch" that will turn the vehicle's emission controls on and off based on whether the vehicle is on the open road (switch off) or being tested for emissions (switch on). In effect when emissions testing is performed on one of these vehicles the emission system turns "on" once a certain set of parameters are met which can include steering wheel position, rear wheel speed, air flow and others. Once the test is complete and the car is restarted, the car reverts to its normal function. And once the cars are in on-the-road mode, nitrogen oxide levels can increase by as much as 10 to 40 times the federal standard.

83.     Bosch warned Volkswagen in 2007 that it would be illegal to sell cars with emissions control software that turned on only during emissions tests, but Bosch continued supplying the systems either fully aware of the defeat devices or blindly choose to ignore what VW was doing upon installation using the software Bosch had provided.

84.     In addition, a group of Volkswagen engineers discovered the use of the defeat device in 2011 and brought it, and the fact that the device was illegal, to the attention of company management.  This report went nowhere and Volkswagen continue utilizing the defeat device.

85.      By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions that were certified to EPA, Volkswagen violated the Clean Air Act, defrauded its customers, and engaged in unfair competition under state and federal law.

### C.     Volkswagen Has Admitted Its Fraudulent Conduct.

86.     On September 20, 2015, Volkswagen admitted that the EPA allegations were true and that a "defeat device" had been used in the Affected Vehicles.  Dr. Martin Winterkorn, then then-CEO of Volkswagen AG stated "*I personally am deeply sorry that we have broken the trust of our customers and the public*."[25]

87.     On September 23, 2015, Dr. Winterkorn resigned as CEO of Volkswagen AG, stating that "*above all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group.*"[26]

88.     Similarly, Mr. Horn reportedly admitted on September 21, 2015:

As you have seen since Friday, the EPA, the Environmental Protection Agency, has issued a statement and reality that Volkswagen Group manipulated engine software in our TDI diesel cars, and we violated emissions standards. The CEO of our parent company, Dr. Martin Winterkorn, said yesterday Volkswagen will fully cooperate with the responsible agencies, and much much more important as  I see it, he stated that he was personally and deeply sorry for this—that Volkswagen has broken the trust of our customers, and the public here in America. And lastly he stated that this matter, and this is I think common sense, now this is the first priority for him personally and for the entire [board]. So let's be clear about this: our company was dishonest with the EPA and the California Air Resources Board, and with all of you. And in my German words, we've totally screwed up. We must fix those cars,

---

[25] *See* Statement of Prof. Dr. Martin Winterkorn, CEO of Volkswagen AG, September 20, 2015, available at http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/statement_ceo_of_volkswagen_ag.html (last accessed October 8, 2015).
[26] *See* Fox Business's "Volkswagen CEO Resigns Amid Emissions Scandal" by Matthew Rocco, September 23, 2015. http://www.foxbusiness.com/business-leaders/2015/09/23/volkswagen-ceo-resigns-amid-emissions-scandal/

and prevent this from ever happening again, and we have to make things right—
with the government, the public, our customers, our employees, and also very
importantly our dealers. This kind of behavior, I can tell you out of my heart, is
completely inconsistent with our core values. The three core values of our brand
are value, innovation, and in this context very importantly, responsibility: for our
employees, for our stakeholders, and for the environment. So it goes totally against
what we believe is right. Along with our German headquarters, we are committed
to do what must be done, and to begin to restore our trust.[27]

89.    Likewise, Mr. Horn has admitted to owners and lessees of the Affected Vehicles

that "Volkswagen has violated your trust" and Volkswagen takes "full responsibility" for the

failure to ensure that "certain 2.0L 4-cylinder TDI vehicles do not comply with emissions

standards."[28]

90.    Indeed, when questioned by Rep. Tim Murphy of Pennsylvania asked Mr. Horn if

the defeat devices were installed "for the express purpose of beating tests," Mr. Horn responded

that "It was installed for this purpose, yes."[29]

91.    As reported by Reuters, Volkswagen named the head of its Porsche unit, Matthias

Muller, as its new chief executive. Muller claims, "[u]nder my leadership, Volkswagen will do all

it can to develop and implement the strictest compliance and governance standards in the whole

industry."[30]

---

[27] *See* Road & Track, "Volkswagen USA CEO: 'We Totally Screwed Up'", September 21, 2015, available at
http://www.roadandtrack.com/new-cars/car-technology/news/a26774/volkswagen-ceo-we-screwed-up/ (last
accessed October 8, 2015).
[28] In this correspondence, Mr. Horn identified the following vehicles: VW Jetta TDI (Model Years 2009-2015); VW
Jetta Sportwagen TDI (Model Years 2009-2014); VW Golf TDI (Model Years 2010-2015): VW Golf Sportwagen
TDI (Model Year 2015); VW Beetle TDI and WV Beetle Convertible TDI (Model Years 2012-2015); and VW
Passat TDI (Model Years 2012-2015).  Mr. Horn's letter failed to mention the 2010 – 2015 Audi A3 TDI which is
also covered by the EPA's NOV.
[29] *See* NPR News, "'It Was Installed For This Purpose,' VW's U.S. CEOTells Congress About Defeat Device," by
Bill Chappell, October, 8, 2015, available at
http://www.npr.org/sections/thetwo-way/2015/10/08/446861855/volkswagen-u-s-ceo-faces-questions-on-capitol-hill
(last accessed October 8, 2015).
[30] *See* CNBC, "Volkswagen names Mueller CEO amid emissions 'disaster'", September 25, 2015, available at
http://www.cnbc.com/2015/09/25/reuters-america-update-1-volkswagen-names-mueller-ceo-amid-emissions-
disaster.html (last accessed October 8, 2015).

92.     That promise may be a tall order considering Germany's transport minister announced that the carmaker has manipulated test results for about 2.8 million vehicles in Germany, which is nearly six times as many as it has admitted to falsifying in the United States. That indicates that Volkswagen is "cheating on a bigger scale than previously thought.[31]

93.     As a result of Volkswagen's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Affected Vehicles emit 40 times the allowed levels, owners and/or lessees of the Affected Vehicles have suffered losses in money and/or property.  Had Plaintiff and Class members known of the "defeat device" at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

94.     Moreover, when and if Volkswagen recalls the Affected Vehicles and degrade the Clean Diesel engine performance in order to make the Affected Vehicles compliant with EPA standards, Plaintiff and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased.  Moreover, the Affected Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency.

**D.     Volkswagen Has Obtained Considerable Benefits From Its Fraudulent Conduct.**

95.     Volkswagen has charged a substantial premium for the Affected Vehicles, ironically marketed by Volkswagen as "Clean Diesel."  For example, for the 2015 Volkswagen Jetta, the base S model has a starting MSRP of $18,780.  The base TDI S Clean Diesel, however, has a starting MSRP of $21,640, a price premium of $2,860.  The Clean Diesel premium for the

---

[31] *See* Reuters, "VW picks company veteran to tackle emissions crisis," September 26, 2015, available at http://in.reuters.com/article/2015/09/25/volkswagen-emissions-idINKCN0RP15Z20150925 (last accessed October 8, 2015).

highest trim Jetta model is substantially higher.  The highest level gas Jetta SE has a starting MSRP of $20,095, while the Clean Diesel TDI SEL MSRP is $26,410, a staggering $6,315 premium.

96.     These premiums occur across all of the vehicles in which Volkswagen installed its "defeat device" for emissions testing.  The table below sets forth the price premium for each base, mid-level and top-line trim for each affected model:

**Clean Diesel Price Premiums**

| Model | Base | Mid-level | Top-line |
|-------|------|-----------|----------|
| VW Jetta | $2,860 | $4,300 | $6,315 |
| VW Beetle | $4,635 | n/a | $2,640 |
| VW Golf | $2,950 | $1,000 | $1,000 |
| VW Passat | $5,755 | $4,750 | $6,855 |
| Audi A3 | $2,805 | $3,095 | $2,925 |

**E.     Plaintiff and Class Members Have Suffered Significant Harm as a Result of Volkswagen's Unlawful Actions.**

97.     Volkswagen will not be able to adequately fix the vehicles.  The EPA has ordered Volkswagen to bring the Affected Vehicles into compliance with the emissions standards of the Clean Air Act, but doing so will materially compromise the vehicles' performance and/or fuel efficiency.

98.     While new Volkswagen AG CEO Matthias Muller asserted on October 7, 2015 "If all goes according to plan, we can start the recall in January. All the cars should be fixed by the

end of 2016,"[32] such rosy predictions only relate to Affected Vehicles in Germany, not those in the United States, and are based on as-yet undisclosed proposed remedies.

99.     Moreover, while Bloomberg Business has reported that Mr. Muller indicated that "Most cars probably only need software reprogramming that can be done at a local service outlet, though some will need new injector systems or some rebuilding at special workshops to install larger catalytic converters," Mr. Muller has conceded that "[r]eplacing cars will be considered in "particular cases."[33]

100.    Despite these assertions regarding putative remedies, as of October 7, 2015 Volkswagen had not provided any specifics on the proposed response in Germany to the German Transportation Ministry.[34]

101.    Furthermore, Volkswagen officials have confirmed that any remedy for the Affected Vehicles in the United States will first have to be agreed to by the EPA.[35]

102.    Moreover, as noted  by Mr. Horn, Defendant Volkswagen has "not had the opportunity to review all aspects of this matter, indeed the investigation is just beginning."[36]

103.    Even if Volkswagen is able to make the Affected Vehicles EPA-compliant through a retrofit, the vehicles will no longer perform as previously represented to the public and

---

[32] *See* The Economic Times, "Volkswagen CEO Matthias Mueller says recall to start in January, be completed end-2016," October 7, 2015, available at  http://economictimes.indiatimes.com/news/international/business/volkswagen-ceo-matthias-mueller-says-recall-to-start-in-january-be-completed-end-2016/articleshow/49251198.cms (last accessed October 7, 2015).

[33] *See* Bloomberg Business, "VW Faces Long Road to Recovery as Diesel Fixes to Take a Year," by Elisabeth Behrmann, October 7, 2015, available at http://www.bloomberg.com/news/articles/2015-10-07/vw-s-mueller-pledges-to-complete-diesel-recalls-by-end-of-2016  (last accessed October 7, 2015).

[34] *Id.*

[35] *See* Automotive News, VW to recall Europe diesels starting in January; U.S. sales to continue for now October 7, 2015, available at "http://www.autonews.com/article/20151006/OEM11/151009879/vw-to-recall-diesel-models-starting-in-january-mueller-says  (last accessed October 7, 2015).

[36] Testimony of Michael Horn, President and CEO of Volkswagen Group of America, Inc. Before the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations, October 8, 2015, available at http://docs.house.gov/meetings/IF/IF02/20151008/104046/HHRG-114-IF02-Wstate-HornM-20151008.pdf (last accessed October 8, 2015).

consumers, and Plaintiff and Class Members will be deprived of the benefits Volkswagen promised and for which they bargained when they purchased or leased the Affected Vehicles.

104.     As a result, the Affected Vehicles do not function as reasonable consumers expect, and have lost considerable value.  Moreover, Plaintiff and Class Members will incur additional expenses at the pump as a result of the decreased fuel efficiency.

105.     Volkswagen failed to disclose these material facts to the public and to consumers. Had Plaintiff and Class Members known of the defect at the time they decided to purchase or lease the Affected Vehicles, they would have declined to purchase or lease the vehicles, or would have paid considerably less than they did.

106.     In sum, Volkswagen's deliberate deception has caused significant harm to Plaintiff, Class Members, and the public.

107.     Plaintiff brings this action for actual damages, equitable relief, including restitution, injunctive relief, and disgorgement of profits, and all other relief available on behalf of themselves and all similarly-situated individuals and entities (the "Class" or "Class Members") who own or lease or who have owned or leased a 2009-2015 Volkswagen or Audi diesel-powered vehicle which contained software specifically designed to avoid and cheat EPA test standards.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

### A.     Discovery Rule Tolling

108.     Class Members had no way of knowing about Volkswagen's deception with respect to the Clean Diesel engine system and "defeat device."  It took federal EPA and CARB investigations to uncover Volkswagen's deception, which involved sophisticated software manipulation on the part of Volkswagen.  As reported by the *Los Angeles Times* on September 18, 2015, it took CARB testing on a special dynamometer in a laboratory, open road testing using portable emission testing equipment, and the use of special testing devised by the Board to uncover

Volkswagen's scheme and to detect how software on the engine's electronic control module was deceiving emissions certifications tests.  Plainly, Volkswagen was intent on expressly hiding its behavior from regulators and consumers. This is the quintessential case for tolling.

109.    Within the time period of any applicable statutes of limitations, Plaintiff and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing the conduct complained of herein and misrepresenting the true position with respect to the emission qualities of their vehicles.

110.    Plaintiff and the other Class Members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Volkswagen did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Volkswagen had information in its possession about the existence of its sophisticated emissions scheme and that they opted to conceal that information, which was discovered by Plaintiff only shortly before this action was filed.  Nor in any event would such an investigation on the part of Plaintiff and other Class members have disclosed that Volkswagen valued profits over compliance with federal and state law, or the trust that Plaintiff and other Class members had placed in its representations, or that, necessarily, Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the true quality and quantity of the emissions, and the emissions software, of its vehicles, or of Volkswagen's emissions scheme.

111.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

### B.       Fraudulent Concealment Tolling

112.    All applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

113.    Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the subject vehicles were far worse than represented, and of its disregard of federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

### C.       Estoppel

114.    Volkswagen was under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of emissions from the vehicles at issue, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and state law.

115.    Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems, and the emissions, of the Affected Vehicles.

116.    Volkswagen was also under a continuous duty to disclose to Plaintiff and Class members that it had engaged in the scheme complained of herein to evade federal and state emissions and clean air standards, and that is systematically devalued compliance with, and deliberately flouted, federal and state law regulating vehicle emissions and clean. Air.

117.    Based on the foregoing, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## VI.    CLASS ALLEGATIONS

118.    Plaintiff brings this action on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class and subclasses (collectively, the "Classes"):

### The Nationwide Class

All persons or entities in the United States who are current or former owners and/or lessees of an "Affected Vehicle."  Affected Vehicles include, without limitation: MY 2009-2015 VW Jetta TDI; MY 2009-2014 VW Jetta Sportwagen TDI; MY 2012-2015 VW Beetle TDI; MY 2012-2015 VW Beetle Convertible TDI; MY 2010-2015 VW Golf TDI; MY 2015 VW Golf Sportwagen TDI; MY 2012-2015 VW Passat TDI; and MY 2010-2015 Audi A3 TDI.

### The Georgia Subclass

All current and former owners of Affected Vehicles who reside in the State of Georgia and/or who purchased or leased Affected Vehicles in Georgia Affected Vehicles include, without limitation:  MY 2009-2015 VW Jetta TDI; MY 2009-2014 VW Jetta Sportwagen TDI; MY 2012-2015 VW Beetle TDI; MY 2012-2015 VW Beetle Convertible TDI; MY 2010-2015 VW Golf TDI; MY 2015 VW Golf Sportwagen TDI; MY 2012-2015 VW Passat TDI; and MY 2010-2015 Audi A3 TDI

119.    Excluded from the Class are individuals who have personal injury claims resulting from the "defeat device" in the Clean Diesel system.  Also excluded from the Class are Defendant Volkswagen and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.  Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

120.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

121.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

122.    <u>Numerosity</u>:  Federal Rule of Civil Procedure 23(a)(1):  The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are not less than hundreds of thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Volkswagen's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notices.

123.    <u>Commonality and Predominance</u>:  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)      Whether Volkswagen engaged in the conduct alleged herein;

b)      Whether Volkswagen designed, advertised, marketed, distributed, leased, sold or otherwise placed Affected Vehicles into the stream of commerce in the United States;

c)      Whether the  Clean Diesel engine system in the Affected Vehicles contains a defect in that it does not comply with U.S. EPA requirements;

d)      Whether the Clean Diesel engine systems in Affected Vehicles can be made to comply with EPA standards without substantially degrading the performance and/or efficiency of the Affected Vehicles;

e)      Whether Volkswagen knew about the "defeat device" and, if so, how long Volkswagen had known;

f)      Whether Volkswagen designed, manufactured, marketed, and distributed Affected Vehicles with a "defeat device;"

g)      Whether Volkswagen's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h)      Whether Plaintiff and the other Class members overpaid for their Affected Vehicles;

i)      Whether Plaintiff and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

j)      Whether Plaintiff and the other Class members are entitled to damages and other monetary relief and, if so, in what manner.

124.    <u>Typicality</u>:  Federal Rule of Civil Procedure 23(a)(3):  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Volkswagen's wrongful conduct as described above.

125.    <u>Adequacy</u>:  Federal Rule of Civil Procedure 23(a)(4):  Plaintiff is an adequate Class representatives because her interests do not conflict with the interests of the other members of the Classes she seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously.  The Classes' interests will be fairly and adequately protected by Plaintiff and their counsels.

126.    <u>Declaratory and Injunctive Relief</u>:  Federal Rule of Civil Procedure 23(b)(2):  Volkswagen has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

39

127.    Superiority:  Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Volkswagen, so it would be impracticable for the members of the Classes to individually seek redress for Volkswagen's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    VIOLATIONS ALLEGED

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(C), THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**
**(Brought on Behalf of the Nationwide Class)**

128.    Plaintiff re-alleges and incorporates by reference all above paragraphs as though fully set forth herein.

129.    Plaintiff brings this claim on behalf of the Nationwide Class.

130.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt." 18 U.S.C. § 1962(c).

131.    This Count, which alleges substantive violations of RICO, as provided in 18 U.S.C. § 1962(c), is asserted against the Defendants on behalf of the Class for actual damages, treble damages, and equitable relief pursuant to 18 U.S.C. § 1964.

132.    As detailed more fully below, Plaintiff and the Class Members are "person[s] injured in his or her business or property" by reason of the Volkswagen's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

## The Clean Diesel RICO Enterprise

133.    Volkswagen AG is the sole owner of Defendant Volkswagen It uses its agent, Defendant Volkswagen, to sell its cars in the United States. Not only does Volkswagen AG use its agent, Defendant Volkswagen, to perform this critical work, it also intimately directs the actions of Defendant Volkswagen, ranging from minute production line decisions to broad marketing strategies.

134.    The remarkable level of centralized and intimate control Volkswagen AG and former CEO Dr. Winterkorn exerted over Defendant Volkswagen is well documented. Volkswagen AG itself describes this highly-centralized structure in its corporate governance document as follows: Volkswagen AG "*targets and requirements [are] laid down by the Board of Management of Volkswagen AG or the Group Board of Management [and] must be complied with in accordance with the applicable legal framework.*" This top-down governance manifests in Volkswagen AG's intimate management of Defendant Volkswagen. For example, in 2011, when Dr. Winterkorn visited the newly built Volkswagen plant in Tennessee, Bloomberg Business reported that "*he berated staff for hanging chrome parts for air vents, doors and gear shifts on the wall. To check that they uniformly glistened before agreeing to use them in the sedan, he wanted*

*them displayed on a table with light shining down at the same angle that customers would see the parts in the car.*"

135.    That single plant in Chattanooga, Tennessee is not Volkswagen AG's only plant in the United States, and it conducts final assembly of only one of the numerous models that Volkswagen AG sells in the United States through Defendant Volkswagen. Even then, the majority of components and parts are manufactured in Volkswagen AG factories in Europe and around the world, or purchased from vendors, and shipped to Tennessee to be assembled.

136.    The other models that Defendant Volkswagen markets and sells in the United States, including vehicles at issue in this lawsuit, are assembled elsewhere in the world, including in Puebla, Mexico and Ingolstadt and Wolfsburg, Germany. The 2.0 liter TDI engines that each of the affected vehicles uses are among the components manufactured by Volkswagen AG factories outside the United States, as are the exhaust system components used to regulate emissions. In sum, Volkswagen AG exerts significant, and sometimes total, control over the design, technology, marketing, and manufacturing of the vehicles it sells through Defendant Volkswagen.

137.    Bloomberg Business has also noted that "*[d]ecision-making at Volkswagen is highly centralized. Winterkorn and a couple dozen managers vet product plans in Wolfsburg, including detailed lists of components that differentiate between new and standardized parts. Winterkorn was aiming to loosen that structure by pushing more authority to brand and regional managers.*" Volkswagen AG's attempts to decentralize are not new; indeed as far back as 2007

138.    The New York Times reported that Volkswagen AG was undergoing a "*broad reorganization that would centralize control over its myriad brands [including Volkswagen Group of America, Inc.] and cement the power of its new chief executive, Martin Winterkorn.*" Whatever decentralization Dr. Winterkorn was hoping to accomplish, however, has not come to pass, as he

has now stepped down as Volkswagen's CEO. In short, Volkswagen AG tightly controls the actions of its agent, Defendant Volkswagen, to perform the critical task of selling its cars in the United States.

139.     As detailed below, upon information and belief, in 2007, three individuals took or were appointed to leadership positions at Volkswagen AG, and/or its subsidiaries Audi AG and Porsche AG: Chief Executive Officer Martin Winterkorn ("Winterkorn"); Porsche's head of Engine and Transmission Development Wolfgang Hatz ("Hatz"); and Audi's head of Technical Development Ulrich Hackenberg ("Hackenberg") (collectively, "the Individual Members"). These individuals exploited their positions of authority as well as the legitimacy and infrastructure of Volkswagen AG, Defendant Volkswagen of America, Inc., Audi AG (collectively, "the Volkswagen Corporate Members"), as well as Robert Bosch GmbH ("Bosch"), a German auto component manufacturer that developed the systems used by the criminal enterprise as "defeat devices," to perpetrate fraud against American consumers as well as state and federal regulators for their own personal and profession gain.

140.     When news that Volkswagen AG and Defendant Volkswagen used "defeat devices" to evade state and federal emissions was made public, each of the Individual Members was immediately identified as being at "at the heart of the affair."[37]Dr. Winterkorn resigned while Mr. Hackenberg and Mr. Hatz, along with Volkswagen's head of research and development, Heinz-Jakob Neusser, were suspended by Volkswagen AG's board of management as a result of their reported involvement in the "defeat device" scandal.

---

[37] *See* Washington Post, "Volkswagen Said to Manage Faked Test Results From Germany," by Alex Webb and David Welch, September 25, 2015, available at http://washpost.bloomberg.com/Story?docId=1376-NV7XKY6S972S01-070HVM2I0AE9U5AUL6PH7OJ0E1 (last accessed October 8, 2015).

141.   Upon information and belief, the Individual Members exploited their leadership positions at Volkswagen AG, Defendant Volkswagen and/or Audi AG and Porsche, as well as the legitimacy and infrastructure of those organizations and Bosch, for personal and professional gain by conducting an enterprise of associated-in-fact entities (the "Clean Diesel Rico Enterprise"), comprised of the Individual Members, the Volkswagen Corporate Members, and Bosch (collectively, "the Enterprise Members"),  designed to secure the leadership positions of the Individual Members and increase the sales of Volkswagen-and Audi-brand diesel vehicles in the United States and elsewhere by concealing and/or misrepresenting the vehicles' emission levels.

142.   Upon information and belief, Mr. Hatz and Mr. Hackenberg, specifically, used their positions of authority and control at a Volkswagen AG subsidiaries—Audi and Porsche—to infiltrate the Volkswagen Group Board of Management, and exercise control over the Group to intentionally conceal and suppress material facts concerning the quality and character of the Affected Vehicles and to evade federal and state vehicle emissions standards by installing software specifically designed to conceal its vehicles' emissions of nitrous oxides.

143.   The Volkswagen Corporate Members and/or the Individual Members compelled and/or condoned the purchase of the 'defeat devices," comprising in part engine management systems and software' designed by Bosch. Bosch is the world's largest manufacturer of automotive components, and maintains a continuous and ongoing relationship with the Volkswagen Corporate Members. Volkswagen Corporate Members and/or the Individual Members used the systems provided by Bosch as the basis for the defeat device, installed them in the Affected Vehicles, and distributed the Affected Vehicles worldwide, including but not limited to the 50 United States and the District of Columbia and conducted a campaign of misrepresentations designed to conceal the true emission levels of affected vehicles and conceal their use of defeat devices.

44

144.    The role of each member of the Clean Diesel RICO Enterprise is described below.

## Dr. Martin Winterkorn – CEO of Volkswagen AG

145.    Dr. Martin Winterkorn succeeded Bernd Pischetsrieder as CEO of Volkswagen AG in 2007.

146.    In 2007, Volkswagen AG was struggling, specifically in the U.S. market, where Volkswagen's AG's performance was described as "disastrous":

> The brand's strategy of wooing customers with premium, uplevel products has not paid off; it is lacking new, interesting, and affordable products in key segments; and its costly production site in Chattanooga, Tennessee, is woefully underutilized.[38]

147.    Dr. Winterkorn was also facing a challenge to his leadership from auto magnate and long-time Volkswagen executive Ferdinand Piëch, who sought to oust Dr. Winterkorn as CEO.[39]

148.    In order to secure his leadership position, Dr. Winterkorn committed to an unprecedented gambit, described as:

> [a] plan to . . . triple [Volkswagen] sales in the United States in just a decade – setting it on a course to sweep by Toyota to become the world's largest automaker . . . by betting on diesel-powered cars. . . [and] promising high mileage and low emissions without sacrificing performance.[40]

149.    Dr. Winterkorn's promise to make Volkswagen AG the "world's largest seller of diesel-powered cars" secured his position as CEO and Piëch was ousted from the organization by Volkswagen's Management Board.

---

[38] Anton Watts, "VW Drama: Why Piech Wants Winterkorn Out—and What the Future May Hold," *Car and Driver* (Apr. 16, 2015).
[39] *Id.*
[40] Danny Hakim, Aaron Kessler, and Jack Ewing, "As Volkswagen Pushed to BeNo. 1, Ambitions Fueled a Scandal," *New York Times* (Sept. 26, 2015).

150.    However, as is now clear, Dr. Winterkorn's promise to the Board to overtake Toyota in the American market through the development of low- emission, consumer-friendly diesel passenger vehicles, while favorable to the investor's bottom line was—absent extraordinary breakthroughs in engineering—a practical impossibility. In short, Dr. Winterkorn overpromised.

151.    Prior to 2007, when Dr. Winterkorn became CEO, in order to reduce emissions from diesel fuel, Volkswagen's diesel-powered vehicles, were equipped with BlueTEC, a selective catalytic reduction (SCR) system that Volkswagen leased from Daimler AG. To function, BlueTEC requires vehicles to carry an onboard tank of urea crystals in mineralized water, a feature which adds to the initial purchase price of the vehicle, and that must be refilled every 10,000 miles at a cost of around $300, which reduces any cost-savings a consumer might realize by using diesel instead of gasoline.

152.    In 2007, the year that Dr. Winterkorn took over as CEO, Volkswagen took two major steps to reverse this trend. First, Volkswagen AG ceased the use of BlueTEC in several of its models—in favor of developing its own emissions- reduction technology, which is now known to rely on the defeat devices which are the subject of this suit. Second, two executives of Volkswagen AG subsidiaries, Mr. Hackenberg  and Mr. Hatz, were given leadership roles at Volkswagen AG.

153.    Mr. Hatz and Mr. Hackenberg were reportedly hand-picked to play a major role in implementing Dr. Winterkorn's plan to make Volkswagen AG the world's number- one automaker, through the development of consumer-friendly, low-emission diesel vehicles.

154.    By implementing these steps and, in turn, economically benefitting from the Clean Diesel RICO Enterprise, Dr. Winterkorn delivered on his promise to sell more diesel cars in the U.S. than every other brand combined. However, Dr. Winterkorn's misdeeds came at a price and

he was forced to resign in September 2015, following allegations that he knew or should have known of the defeat devices installed in the Affected Vehicles.

155.    Upon stepping down, Dr. Winterkorn asserted he was unaware of any wrong doing. However, that assertion is belied by newly-disclosed information that Volkswagen engineers discovered the use of the defeat device in 2011 and brought it, and the fact that the device was illegal, to the attention of company management. Volkswagen apparently ignored that report and continued their fraudulent and deceptive practices.

156.    In their leadership positions within Volkswagen AG, the Individual Members ordered the development of and/or personally developed each of the affected diesel-vehicle models that are the subject of this suit. Also in those positions, each Individual Member had access to and authority over the engine development and technical details of each affected Volkswagen vehicle that is the subject of this suit.

**Ulrich Hackenberg**

157.    Mr. Hackenberg joined Audi AG in 1989 and was put in charge of Audi Concept Definition. Later, he took over technical project management for Audi's entire product range, including the Audi A3, one of the affected vehicle models.[41]

158.    On February 1, 2007, Mr. Hackenberg was appointed as a Member of Volkswagen's Brand Board of Development, where he was responsible for the technical

---

[41] Audi, "Board of Management," http://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-hackenberg, (last accessed Sept 26, 2015) ("In 1985 Prof. Dr. Hackenberg joined AUDI AG, where in 1989 he was put in charge of Concept Definition and later took over the technical project management of the entire product range. This included the models Audi 80, A3, A4, A6, A8, TT and A2."); Autoblog, "Hackenberg says next Audi A4 set for Frankfurt debut," (Mar. 10, 2015).

development of all the Volkswagen Group's brands.[42]   Under his leadership, three new models were developed: the Golf, the Polo, and the Passat, two of which are affected vehicle models.

159.   On July 1, 2013, Mr. Hackenberg was appointed to the Board of Management of Audi AG, and given the responsibility to head up Audi AG's Technical Development.

160.   As head of technical development at Audi AG, Mr. Hackenberg spearheaded the development of Audi's TDI "Clean Diesel" engines. As he explained in a press release, his strategy for Audi's technical development included the following:

> P]ushing forward with development in . . . our TDI engines in the USA – our clean diesel offensive is bearing substantial fruit. In China, too, we are already introducing the first clean diesel models and watching developments there very closely. We also expect a great deal from g-tron technology, the most sustainable type of gas drive.[43]

161.   In his role as head of technical development at Audi AG, Mr. Hackenberg had extensive knowledge of the technical details of the TDI "Clean Diesel" models that he developed, and was reportedly suspended after reports that he had knowledge that the Affected Vehicles used defeat devices to evade federal and state vehicle emissions standards.

## Wolfgang Hatz

162.   Wolfgang Hatz joined Volkswagen AG in 2001 and at various times directed engine development for the Porsche, Audi, and Volkswagen brands.

163.   In his role as the head of Engines and Transmissions Development, Mr. Hatz supervised the development of the engines and transmissions for the Affected Vehicles and had knowledge of the technical details of each those vehicles.

---

[42] Audi, "Board of Management," http://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-hackenberg, (last accessed Sept. 26, 2015).
[43] Audi AG, "Gentlemen Start Your Engines," http://audi- encounter.com/magazine/technology/01-2015/126-gentlemen-start-your-engines (2014).

164.    Mr. Hatz was reportedly suspended from his position in September 2015 after reports that he had knowledge that the affected Audi and Volkswagen vehicles used defeat devices to evade federal and state vehicle emissions standards.

### Allegations Common to the Individual Members

165.    Upon information and belief, in their leadership roles at Volkswagen AG, the Individual Members used Volkswagen AG and its subsidiaries, including Defendant Volkswagen, Volkswagen's resources, as well as supplier Bosch, to orchestrate a scheme to fulfill Dr. Winterkorn's promise to the Board to triple Volkswagen's sales in the United States through the sale of low-emission diesel vehicles by ordering, developing, and/or installing defeat devices in the Affected Vehicles and, through a pattern of racketeering activity, misrepresenting and/or concealing the true emissions levels of those vehicles.

166.    In addition to the pattern of racketeering detailed herein, the Individual Members exploited Volkswagen's, its subsidiaries', and Bosch's resources, including employees and engineers, in order to further the cover-up. For example, according to reports from "[e]missions testers at the company's site in Westlake Village, California [which] evaluated all [Volkswagen] cars," Volkswagen and Audi executives orchestrated a cover-up from abroad:

> …any vehicle failed to meet emissions targets, a team of engineers from Volkswagen headquarters [in Wolfsburg, Germany] or luxury brand Audi's base in Ingolstadt [Germany] was flown in…. After the group had tinkered with the vehicle for about a week, the car would then pass the test. VW had no engineers in the U.S. able to create the mechanism that cheated on the test or who could fix emissions problems, according to two other people.[44]

---

[44] *See* Washington Post, "Volkswagen Said to Manage Faked Test Results From Germany," by Alex Webb and David Welch, September 25, 2015, available at http://washpost.bloomberg.com/Story?docId=1376-NV7XKY6S972S01-070HVM2I0AE9U5AUL6PH7OJ0E1 (last accessed October 8, 2015).

167.    In other words, any vehicles that failed emissions targets received special treatment—that is, was fitted with a defeat device—and then the vehicle would pass the emissions test.

168.    In their leadership roles at Volkswagen AG and its subsidiaries, including Defendant Volkswagen, the Individual Members used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere.

169.    In their leadership roles at Volkswagen AG and its subsidiaries, including Defendant Volkswagen, the Individual Members used Volkswagen AG's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers.

170.    As a result of the Individual Members' misuse of Volkswagen AG's resources and infrastructure, they achieved considerable personal and financial success.

**Allegations Against the Volkswagen Corporate Members**

171.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below.

172.    The Volkswagen Corporate Members collaborated and colluded with each other with and the Individual Members to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants.

**Allegations Against Robert Bosch GmbH ("Bosch")**

173.    On information and belief, Bosch developed the engine and emissions control systems and software that provided the basis for the defeat devices, and sold them to Volkswagen.

174. On information and belief, Bosch was aware that the use of "test" or "dynometer" operation modes programmed into engine management software as defeat devices to evade emissions requirements is illegal in the United States, but nevertheless sold the systems and software to Volkswagen AG.

175. In 2007, when Volkswagen was developing the TDI engines that are the subject of the present suit using Bosch engine management software, Bosch issued a letter to the Volkswagen AG warning them that the use of "test" or "dynometer" modes included in the software during normal operation of a vehicle was illegal.

176. Bosch was reckless in not being aware of Dr. Winterkorn's promise ambitions to the Board to overtake Toyota's sales in the American market and to become the largest auto manufacturer in the world, through the sale of low- emission diesel passenger vehicles.

177. Bosch was reckless in not being aware that the illegal use of its software as a defeat device would help to achieve Dr. Winterkorn's promise.

178. Bosch was or should have been further aware that sales of Volkswagen vehicles that had Defeat Devices installed were increasing at an unprecedented rate.

179. Based upon the above-alleged pieces of information Bosch, as one of the largest and most successful component manufacturers in the world, knew or should have known, or was recklessly in not knowing, that engine management systems and software it supplied, designed, managed and or installed were being used as part of defeat devices illegally used in Volkswagen vehicles sold in the United States and around the world.

**Enterprise Allegations**

180. Defendant Volkswagen is a "person" under 18 U.S.C. § 1961(3).

181. Volkswagen AG is a "person" under 18 U.S.C. § 1961(3).

182.    Audi AG is a "person" under 18 U.S.C. § 1961(3).

183.    Dr. Winterkorn is a "person" under 18 U.S.C. § 1961(3).

184.    Mr. Hatz is a "person" under 18 U.S.C. § 1961(3).

185.    Mr. Hackenberg is a "person" under 18 U.S.C. § 1961(3).

186.    Bosch is a "person" under 18 U.S.C. § 1961(3).

187.    The Clean Diesel RICO Enterprise engaged in, and affected interstate and foreign commerce, and is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(3) and consists of "persons" --- including Defendant Volkswagen, Volkswagen AG, Audi AG, Dr. Winterkorn, Mr. Hatz, Mr. Hackenberg, and Bosch --- associated together for the common purpose of employing the multiple, deceptive, abusive, illegal, and/or fraudulent acts described herein.

188.    The Clean Diesel RICO Enterprise was formed in or about 2007 and continues to the present day.

189.    On information and belief, the Individual Members and the Volkswagen Corporate Members, violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Clean Diesel RICO Enterprise and/or engaging in a pattern of repeatedly defrauding consumers.

190.    In addition, Bosch violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Clean Diesel RICO Enterprise through a pattern that it knew or should have known defrauded consumers.

191.    The Enterprise undertook a fraudulent scheme to sell Affected Vehicles based upon the false and misleading misrepresentations and omissions set forth herein.

192.    In furtherance of the scheme, the Volkswagen Corporate Members and/or Individual Members engaged in thousands of acts of mail fraud and wire fraud, each of which

constitute "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1), as will be further detailed below.

193.    The Clean Diesel RICO Enterprise is an ongoing organization with an ascertainable structure and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Enterprise members have engaged and are engaging. Each member of the Enterprise performs a role in furtherance of the scheme consistent with its structure. The Enterprise was controlled by the Volkswagen Corporate Members and/or the Individual Members who developed the defeat device scheme and developed the cars and engines that would put it into place. Upon direction from the Volkswagen Corporate Members and/or Individual Members, Bosch knew was reckless in not knowing the illegal purpose for which the defeat devices software it developed and supplied to the Volkswagen Corporate Members was being used, and the Volkswagen Corporate Members distributed the vehicles alongside a marketing campaign designed to misrepresent the Affected Vehicles' emission levels and defraud consumers.

194.    The Enterprise also exists for the legitimate purpose of developing, manufacturing, and selling automobiles and operates within a framework that includes the sale of other automobiles not affected by fraud.

195.    Alternatively, the Enterprise was formed solely for the purpose of carrying out the pattern of racketeering acts described herein.

196.    The Enterprise was and is used by the Individual Members and/or the Volkswagen Corporate Members to effectuate a pattern of racketeering activity. All members of the Clean Diesel RICO Enterprise played a part in a fraudulent scheme to sell affected vehicles through the

use of false or misleading statements related to the power, fuel efficiency, and emissions levels of the Affected Vehicles.

197.   The members of the Enterprise shared a common purpose to develop and sell vehicles, of which certain models included a functioning Defeat Device.

198.   On information and belief, the Volkswagen Corporate Members and Individual Members of the Enterprise also shared a common purpose which amounted to fraud: to misrepresent the emission levels, fuel efficiency, performance, and power of affected Volkswagen vehicles and/or to conceal information regarding the use of defeat devices in the Affected Vehicles to evade state and federal emission regulations. Bosch knew or was reckless in not knowing that this was occurring and that Bosch software was being used to achieve it.

199.   Each member of the Enterprise benefits from the common purpose. For the Volkswagen Corporate Members, the purpose was to avoid the additional costs associated with developing and installing low-emissions diesel technology that would also be attractive to consumers, and to sell and lease more vehicles to consumers based upon false representations of the Affected Vehicles' performance and emissions levels. Succinctly put, the common purpose was to profit from the myth of the "holy grail" of high performance, efficient, low emissions vehicles. For the Individual Members, the purpose of the scheme was to further their own professional and pecuniary interests through misuse of the Corporate Members' resources. For Bosch, the purpose was to increase the sales of components to Volkswagen and thus realize monetary profit from the scheme.

200.   The Clean Diesel RICO Enterprise is separate and distinct from the pattern of racketeering activity. The Enterprise was an ongoing organization or group and existed to advance the interests of the individual entities that comprise its membership, as noted above.

54

201. The Clean Diesel RICO Enterprise, whose activities affected interstate and foreign commerce, is an association in fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of persons associated together for the above described common purposes.

202. Volkswagen AG and its subsidiaries, Volkswagen Group America, Inc. and Audi AG; Bosch; Martin Winterkorn, Ulrich Hackenberg, and Wolfgang Hatz are entities separate and distinct from one another and from the Enterprise. All of the Enterprise members are independent legal entities with the authority to act independently of the Enterprise and the other Enterprise members.

203. The Individual Members, the Volkswagen Corporate Members, and Bosch, and their respective officers and employees, together, knowingly or recklessly, developed the defeat devices and the Affected Vehicles and/or the operative technology in the Affected Vehicles.

204. The Individual Members, the Volkswagen Corporate Members, and their respective officers and employees developed the false, misleading and/or deceptive advertisements described above.

**Pattern of Racketeering Activity**

205. As set forth above, the Corporate Members and the Individual Members conducted and participated in the affairs of the Enterprise.

206. In furtherance of the scheme, the Volkswagen Corporate Members engaged in thousands, or more, acts of mail fraud and wire fraud, each of which constitute "racketeering activity," as the term is defined in 18 U.S.C. § 1961(1).

207.    Specifically, the pattern consisted of numerous and repeated violations of the federal mail and wire fraud statutes—namely 18 U.S.C. §§ 1341 and 1343—that prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud.

208.    The Volkswagen Corporate Members and/or Individual Members, with the assistance and collaboration of the other persons associated in fact with the Enterprise, devised and employed a fraudulent scheme to suppress and conceal the true emissions levels of the affected vehicles and by use of the mails, telephone and internet transmitted, or caused to be transmitted, by means of wire communication traveling in interstate or foreign commerce, writing(s) and/or signal(s), including but not limited to Volkswagen and Audi's websites, Service Bulletins to dealers, vehicle owners' manuals, press releases, advertisements, communications with federal and state regulators, and communications with other members of the enterprise, for the purpose of executing that scheme or artifice to defraud, in violation of 18 U.S.C. §§ 1341 and 1343. Defendants' pattern of conduct is exemplified below.

209.    In December 2014, in response to concerns raised by CARB and the EPA, Volkswagen was permitted to issue recall letters for certain 2-liter diesel 2010-2014 models. The letters, sent to owners and lessees of certain Affected Vehicles needed to return their cars in order to install a software update that would fix an issue with a malfunctioning indicator light.

210.    In or about April 2015, Volkswagen sent letters to owners and lessees of Affected Vehicles as part Emissions Service Action 2306, which were sent through the United States Mail, instructing them to take their cars to a dealer in order to install a software update that would alter their vehicles' tailpipe emissions so as to "optimize . . . operating efficiency." In reality, the software update was intended only to continue to evade state emissions tests and the letter was intended to (and did) perpetrate fraud against consumers and government regulators.

211.    Specifically, it indicated that "if the [light] illuminates for any reason, your vehicle will not pass an . . . emission inspection."[45]   In reality, the update was intended only to allow the continued evasion of state emission tests and the letter was intended to perpetrate fraud against consumers and government regulators.

212.    As detailed above, Volkswagen has continuously and, as recently as September 17, 2015, in television, internet and print advertisements, falsely represented that its Affected Vehicles were "clean diesel" vehicles, which emitted less greenhouse gas than other models, when in fact they emitted 10 to 40 times more greenhouse gases than legally permitted by state and federal regulations.

213.    In addition to the foregoing, each download or view of one of the advertisements described above constituted a separate offense.

214.    Continually, and as recently as September 17, 2015, Volkswagen transmitted fraudulent reports to the EPA indicating that their Affected Vehicles met emissions targets as required by law,[46] when in fact they emit 10 to 40 times more greenhouse gases than permitted by state and federal regulation.

### <u>Plaintiff's Injuries and Damages</u>

215.    As a direct result of the foregoing violations of 18 U.S.C. § 1962(d), Plaintiff and the Class Members have been injured their business and/or property by reason of the Clean Diesel RICO Enterprise's conduct in at least the following ways:

(1) Plaintiff and Class members who purchased or leased Affected Vehicles were
   fraudulently induced into making those transactions and/or paying more than

---

[45] *See* Reuters, "Exclusive: VW recall letters in April warned of an emissions glitch," by Alexandria Sage, September 23, 2015, available at *http://in.reuters.com/article/2015/09/24/usa-volkswagen-letters-idINKCN0RO0NG20150924* (last accessed October 8, 2015).

[46] *See* Washington Post, "Volkswagen Said to Manage Faked Test Results From Germany," by Alex Webb and David Welch, September 25, 2015, available at http://washpost.bloomberg.com/Story?docId=1376-NV7XKY6S972S01-070HVM2I0AE9U5AUL6PH7OJ0E1 (last accessed October 8, 2015).

they otherwise would have had the true emissions and performance information of the Affected Vehicles been revealed; and

(2) The value of the vehicles Plaintiff and Class members purchased has been reduced, and if they can resell their vehicles at all, the resale value has decreased dramatically.

216.    But for the predicate acts described above—including the numerous false and misleading statements (and marketing and advertising containing omissions) sent via the U.S. mail and interstate wires—Plaintiff and Class Members would not have paid as high a price for the Affected Vehicles as they did, or would not have purchased the Affected Vehicles at all.

217.    By reason of the foregoing, Defendant Volkswagen, has unlawfully, knowingly, and willfully conducted and participated directly or indirectly in the foregoing Defeat Device Enterprise through a pattern of racketeering activity in violation or attempted violation of 18 U.S.C. § 1962(c).

218.    These violations of 18 U.S.C. § 1962(c) by Defendant Volkswagen has directly and proximately caused Plaintiffs' and Class members' injuries and damages as set forth above.

219.    Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as punitive damages, injunctive and/or equitable relief, and their costs and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## FRAUD BY CONCEALMENT
### (Brought on Behalf of the Nationwide Class)

220.    Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

221.    This claim is brought on behalf of the Nationwide Class.

222.    Volkswagen intentionally concealed and suppressed material facts concerning the quality of the Affected Vehicles. Volkswagen engaged in a secret scheme to conceal the fact that

its Clean Diesel engine systems were not EPA-compliant. In doing so, Volkswagen used a "defeat device" designed to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately induced false readings.

223.    In doing so, Volkswagen intentionally concealed the reality that the Clean Diesel engine systems in the Affected Vehicles were not EPA-compliant and used a 'defeat device," or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members' information that is highly relevant to their purchasing decisions.

224.    Volkswagen further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

225.    Volkswagen knew these representations were false when made.

226.    The Affected Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, non-EPA-compliant, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Clean Diesel engine system, as alleged herein.

227.    Volkswagen had a duty to disclose that these Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective Clean Diesel engine system, because Plaintiffs and the other Class members relied on Volkswagen's material representations that the Affected Vehicles they were purchasing were safe, environmentally clean, efficient and free from defects.

228.    Volkswagen had a duty to disclose its emissions scheme because knowledge of the scheme and its details were known and/or accessible only to Volkswagen and its suppliers, because Volkswagen had superior knowledge as to implementation and maintenance of its scheme, and because Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiffs or Class members.

229.    Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to them as clean diesel cars, or cars with clean diesel engines, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding its emissions scheme, the actual emissions of its vehicles, its actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and its actual practices with respect to the vehicles at issue.

230.    Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Affected Vehicles purchased or leased by Plaintiffs and Class members. Whether a manufacturer's products comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certification testing its vehicles must pass. Volkswagen represented to Plaintiffs and Class members that they were purchasing clean diesel vehicles, and certification testing appeared to confirm this—except that, secretly, Volkswagen had subverted the testing process thoroughly.

231.    The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Affected Vehicles at the prices they paid.

232.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for Affected Vehicles to pass EPA emissions requirements.

233.    Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Volkswagen money, and it did so at the expense of Plaintiffs and Class members. On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiffs and Class members by concealing material information regarding the emissions qualities of its vehicles and its emissions scheme.

234.    Plaintiffs and the other Class members reasonably relied on Volkswagen's reputation and upon its representations – along with Volkswagen's failure to disclose the faulty and defective nature of the Clean Diesel engine system and Volkswagen's affirmative assurance that its Affected Vehicles were safe and reliable, and other similar false statements – in purchasing or leasing Volkswagen's Affected Vehicles.

235.    Plaintiff and Class members reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and gravely misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of

deception. Plaintiffs and Class members did not, and could not, unravel Volkswagen's deception on their own.

236.    Plaintiff and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs and Class Members' actions were justified.

237.    Volkswagen and its suppliers were in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs, or Class members. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

238.    Because of the concealment and/or suppression of the facts, Plaintiffs and Class members have sustained damage because they own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions and Volkswagen's failure to timely disclose the actual emissions qualities and quantities of hundreds of thousands of Volkswagen- and Audi-branded vehicles and the serious issues engendered by Volkswagen's corporate policies. Had Plaintiffs and Class members been aware of Volkswagen's emissions scheme, and the companies' callous disregard for compliance with applicable federal and state laws and regulations, Plaintiffs and Class members who purchased or leased new or previously owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

239.    The value of Plaintiff's and Class Members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of its emissions scheme, which has greatly tarnished the Volkswagen and Audi brand names attached to Plaintiff' and class members' vehicles and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles. In addition, Class members are entitled to damages for loss of use, costs of additional fuel, costs of unused warranties, and other damages to be proved at trial.

240.    Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## COUNT III
## UNJUST ENRICHMENT
### (Brought on Behalf of the Nationwide Class)

241.    Plaintiff re-alleges and incorporates by reference all above paragraphs as though fully set forth herein.

242.    This claim is brought on behalf of the Nationwide Class.

243.    Volkswagen has received and retained a benefit from Plaintiffs and the Class, resulting in inequity.

244.    Volkswagen has benefitted from selling and leasing vehicles whose value was artificially inflated by Volkswagen's concealment of the vehicles' performance and emissions problems for far more than they were worth, at a profit. Plaintiffs and members of the Class have overpaid for these vehicles.

245.     Volkswagen has further benefitted by avoiding the costs of a recall and other lawsuits, and has benefitted from its statements about the success of Volkswagen diesel vehicles.

246.     Thus, all Class Members have conferred a benefit on Volkswagen.

247.     It is inequitable for Volkswagen to retain these benefits.

248.     Plaintiffs were not aware of the true facts of Volkswagen-branded diesel vehicles and did not benefit from Volkswagen's conduct.

249.     Volkswagen knowingly accepted the benefits of its unjust conduct.

250.     As a result of Volkswagen's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be determined at trial.

## COUNT IV
## BREACH OF WARRANTY
### (Brought on Behalf of the Nationwide Class)

251.     Plaintiff re-alleges and incorporates by reference all above paragraphs as though fully set forth herein.

252.     This claim is brought on behalf of the Nationwide Class.

253.     By advertising the "green" and "clean" qualities of its diesel engines, Volkswagen expressly warranted to Plaintiffs and Class Members that the vehicles at least complied with all applicable laws and regulations relating to exhaust emissions, as it would be impossible for an automobile to be "green" if it emitted more pollutants than were allowed by applicable environmental laws and regulations.

254.     Moreover, by advertising the low emissions in combination with statements regarding the performance, torque, and fuel efficiency, Volkswagen warranted to purchasers of the Affected Vehicles that the vehicles would exhibit this combination of characteristics.  Such statements became the basis of the bargain for Plaintiffs and other Class Members because such

statements are among the facts a reasonable consumer would consider material in the purchase of a vehicle.

255.    In fact, in ordinary driving conditions, the Affected Vehicles did not comply with applicable environmental regulations, and instead emitted between 10 and 40 times the amount of pollutants allowed during normal operation.  As such, it was unlawful for Volkswagen to sell the vehicles to the public.

256.    In addition, Volkswagen stated that the vehicles achieved certain fuel economy when tested in accordance with applicable EPA regulations.  Those statements created an express warranty that the vehicle achieved the stated fuel efficiency, allowing consumers to make apples-to-apples comparisons with other vehicles.

257.    Testing under EPA regulations presupposes that the vehicles comply with all laws and regulations applicable to automobiles, including environmental regulations.

258.    In fact, had the Affected Vehicles been tested in accordance with EPA fuel efficiency standards while also complying with pollution regulations, they would have achieved significantly lower fuel efficiency than was stated on the EPA mileage sticker on the vehicle.

259.    In addition, the Affected Vehicles are not adequately labeled because they misstate that the Affected Vehicles comply with EPA regulations, and the stated gas mileage for comparison purposes was not achieved by testing in accordance with EPA testing procedures.

260.    As a result of the foregoing breaches of express warranty, Plaintiffs and other Class Members have been damaged in that they purchased vehicles that were unlawfully sold, did not comply with government regulations, did not perform as promised, and were less valuable than what they paid for.

## COUNT V
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

**(Brought on Behalf of the Nationwide Class)**

261.     Plaintiff re-alleges and incorporates by reference all above paragraphs as though fully set forth herein.

262.     Plaintiffs bring this claim on behalf of the Nationwide Class.

263.     Plaintiffs and the Class brings this claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. ("the Act").

264.     The Affected Vehicles are consumer products as defined in 15 U.S.C. § 2301(1).

265.     Volkswagen are suppliers and warrantors as defined in I5 U.S.C. § 2301(4),(5).

266.     Plaintiffs and the Class received written warranties as defined in 15 U.S.C. §2301(6)(A) and/or (B), which Volkswagen have each breached.

267.     Plaintiffs and the Class are "consumers" as defined in 15 U.S.C. § 2301(3).  They are consumers because they bought or leased an Affected Vehicle, they are entitled under the law to enforce both written and implied warranties.

268.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs and the Class are not required to provide Volkswagen with notice of this class action and an opportunity to cure until the time the Court determines the representative capacity of Plaintiffs pursuant to Fed.R.Civ.P. 23.

269.     Volkswagen is liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(l) because they breached its written warranties.

270.     Further, in connection with the sale of the Affected Vehicles, Volkswagen gave an implied warranty under the Act.  As part of that implied warranty, Volkswagen warranted that the Affected Vehicles complied with all applicable federal and state regulations, including emission regulations. Volkswagen breached the implied warranty of merchantability.

271.     Plaintiffs and the Class are entitled to damages caused by Volkswagen's breaches of the warranties, including economic damages based upon either a return of Plaintiffs and Class Members purchase price; and/or the difference between the price paid for the Affected Vehicles as warranted and the actual value of the Affected Vehicle as delivered, and consequential damages.

272.     In addition, Plaintiffs and the Class are entitled to reasonable attorneys' fees and costs as determined by the Court.

**COUNT VI**
**VIOLATION OF THE GEORGIA RICO ACT**
**(O.C.G.A. § 16-14-4)**
**(Brought on Behalf of the Georgia Subclass)**

273.     Plaintiff re-alleges and incorporate by reference all above paragraphs as though fully set forth herein.

274.     Plaintiff Killebrew brings this claim individually and on behalf of the Georgia Subclass.

275.     Plaintiff Killebrew and the Georgia Subclass allege substantive violations of Section 16-14-4(a) of the Georgia RICO Act by against Defendant Volkswagen and seek actual damages, treble damages, and equitable relief pursuant to O.C.G.A. § 16-14-6.

276.     Section 16-14-4(a) makes it "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A. § 16-14-4(a).

277.     Plaintiff Killebrew and the Georgia Subclass allege substantive violations of Section 16-14-4(b) of the Georgia RICO Act by against Defendant Volkswagen and seek actual damages, treble damages, and equitable relief pursuant to O.C.G.A. § 16-14-6.

278. Section 16-14-4(b) makes it "unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity." O.C.G.A. § 16-14-4(b).

279. Plaintiff Killebrew and the Georgia Subclass allege substantive violations of Section 16-14-4(c) of the Georgia RICO Act by against Defendant Volkswagen and seek actual damages, treble damages, and equitable relief pursuant to O.C.G.A. § 16-14-6.

280. Section 16-14-4(c) makes it "unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (a) or (b) of this Code section." O.C.G.A. § 16-14-4(c).

281. As detailed more fully below, Plaintiff Killebrew and the members of the Georgia Subclass are "person[s] … injured by reason of any violation of Code Section 16-14-4" by and are entitled to relief from Volkswagen under O.C.G.A. § 16-14-6(c)

## The Clean Diesel RICO Enterprise

282. Volkswagen AG is the sole owner of Defendant Volkswagen Group of America, Inc. It uses its agent, Volkswagen Group of America, Inc., to sell its cars in the United States. Not only does Volkswagen AG use its agent, Volkswagen Group of America, Inc., to perform this critical work, it also intimately directs the actions of Volkswagen Group of America, Inc., ranging from minute production line decisions to broad marketing strategies.

283. The remarkable level of centralized and intimate control Volkswagen AG and former CEO Dr. Winterkorn exert over Defendant Volkswagen Group of America, Inc. is well documented. Volkswagen AG itself describes this highly-centralized structure in its corporate governance document as follows: Volkswagen AG "*targets and requirements [are] laid down by the Board of Management of Volkswagen AG or the Group Board of Management [and] must be complied with in accordance with the applicable legal framework.*" This top-down governance

manifests in Volkswagen AG's intimate management of Volkswagen Group of America, Inc. For example, in 2011, when Dr. Winterkorn visited the newly built Volkswagen plant in Tennessee, Bloomberg Business reported that "*he berated staff for hanging chrome parts for air vents, doors and gear shifts on the wall. To check that they uniformly glistened before agreeing to use them in the sedan, he wanted them displayed on a table with light shining down at the same angle that customers would see the parts in the car.*"

284.    That single plant in Chattanooga, Tennessee is not Volkswagen AG's only plant in the United States, and it conducts final assembly of only one of the numerous models that Volkswagen AG sells in the United States. Even then, the majority of components and parts are manufactured in Volkswagen AG factories in Europe and around the world, or purchased from vendors, and shipped to Tennessee to be assembled. The other models that Volkswagen Group of America, Inc. markets and sells in the United States, including vehicles at issue in this lawsuit, are assembled elsewhere in the world, including in Puebla, Mexico and Ingolstadt and Wolfsburg, Germany. The 2.0 liter TDI engines that each of the affected vehicles uses are among the components manufactured by Volkswagen AG factories outside the United States, as are the exhaust system components used to regulate emissions. In sum, Volkswagen AG exerts significant, and sometimes total, control over the design, technology, marketing, and manufacturing of the vehicles it sells through Volkswagen Group of America, Inc.

285.    Bloomberg Business has also noted that "[*d]ecision-making at Volkswagen is highly centralized. Winterkorn and a couple dozen managers vet product plans in Wolfsburg, including detailed lists of components that differentiate between new and standardized parts. Winterkorn was aiming to loosen that structure by pushing more authority to brand and regional managers.*" Volkswagen AG's attempts to decentralize are not new; indeed as far back as 2007

286.    The New York Times reported that Volkswagen AG was undergoing a "*broad reorganization that would centralize control over its myriad brands [including Volkswagen Group of America, Inc.] and cement the power of its new chief executive, Martin Winterkorn*." Whatever decentralization Dr. Winterkorn was hoping to accomplish, however, has not come to pass, as he has now stepped down as Volkswagen's CEO. In short, Volkswagen AG tightly controls the actions of its agent, Defendant Volkswagen Group of America, Inc., to perform the critical task of selling its cars in the United States.

287.    As detailed below, upon information and belief, in 2007, three individuals took or were appointed to leadership positions at Volkswagen AG, and/or its subsidiaries Audi AG and Porsche AG: Chief Executive Officer Martin Winterkorn ("Winterkorn"); Porsche's head of Engine and Transmission Development Wolfgang Hatz ("Hatz"); and Audi's head of Technical Development Ulrich Hackenberg ("Hackenberg") (collectively, "the Individual Members"). These individuals exploited their positions of authority as well as the legitimacy and infrastructure of Volkswagen AG, Defendant Volkswagen of America, Inc., Audi AG (collectively, "the VW Corporate Members"), as well as Robert Bosch GmbH ("Bosch"), a German auto component manufacturer that developed the systems used by the criminal enterprise as "defeat devices," to perpetrate fraud against American consumers as well as state and federal regulators for their own personal and profession gain.

288.    When news that Volkswagen AG used "defeat devices" to evade state and federal emissions was made public, each of the Individual Members was immediately identified as being at "at the heart of the affair." Dr. Winterkorn resigned while Mr. Hackenberg and Mr. Hatz, along with Volkswagen's head of research and development, Heinz-Jakob Neusser, were suspended by

Volkswagen AG's board of management as a result of their reported involvement in the "defeat device" scandal.

289.   Upon information and belief, the Individual Members exploited their leadership positions at Volkswagen AG, Volkswagen Group of America, Inc. and/or Audi AG and Porsche, as well as the legitimacy and infrastructure of those organizations and Bosch, for personal and professional gain by conducting an enterprise of associated-in-fact entities (the "Clean Diesel Rico Enterprise"), comprised of the Individual Members, the Volkswagen Corporate Members, and Bosch (collectively, "the Enterprise Members"),  designed to secure the leadership positions of the Individual Members and increase the sales of Volkswagen-and Audi-brand diesel vehicles in the United States and elsewhere by concealing and/or misrepresenting the vehicles' emission levels.

290.   Upon information and belief, Mr. Hatz and Mr. Hackenberg, specifically, used their positions of authority and control at a Volkswagen AG subsidiaries—Audi and Porsche—to infiltrate the Volkswagen Group Board of Management, and exercise control over the Group to intentionally conceal and suppress material facts concerning the quality and character of the Affected Vehicles and to evade federal and state vehicle emissions standards by installing software specifically designed to conceal its vehicles' emissions of nitrous oxides.

291.   The Volkswagen Corporate Members and/or the Individual Members compelled and/or condoned the purchase of the 'defeat devices," comprising in part engine management systems and software' designed by Bosch. Bosch is the world's largest manufacturer of automotive components, and maintains a continuous and ongoing relationship with the Volkswagen Corporate Members. Volkswagen Corporate Members and/or the Individual Members used the systems provided by Bosch as the basis for the defeat device, installed them in the Affected Vehicles, and distributed the Affected Vehicles worldwide, including but not limited to the 50 United States and

71

the District of Columbia and conducted a campaign of misrepresentations designed to conceal the true emission levels of affected vehicles and conceal their use of defeat devices.

292.    By compelling and/or condoning the installation of defeat devices in the Affected Vehicles in order to evade federal and state vehicle emissions standards, the Volkswagen Corporate Members engaged in racketeering acts under O.C.G.A. § 16-14-3(9)(A).

293.    By compelling and/or condoning the installation of defeat devices in the Affected Vehicles in order to evade federal and state vehicle emissions standards, the Volkswagen Corporate Members engaged in racketeering acts under O.C.G.A. § 16-14-3(9)(A) which were intended and targeted to deceive, mislead and/or induce reliance on false statements by Plaintiff Killebrew and the members of the Georgia Subclass, and those racketeering acts did directly and proximately caused, injuries and damages to Plaintiff Killebrew and the members of the Georgia Subclass.

294.    By intentionally concealing and suppressing material facts concerning the quality and character of the Affected Vehicles, the Volkswagen Corporate Members engaged in racketeering acts under O.C.G.A. § 16-14-3(9)(A).

295.    By intentionally concealing and suppressing material facts concerning the quality and character of the Affected Vehicles, the Volkswagen Corporate Members engaged in racketeering acts under O.C.G.A. § 16-14-3(9)(A which were intended and targeted to deceive, mislead and/or induce reliance on false statements by Plaintiff Killebrew and the members of the Georgia Subclass, and those racketeering acts did directly and proximately caused, injuries and damages to Plaintiff Killebrew and the members of the Georgia Subclass.

296. By compelling and/or condoning the installation of defeat devices in the Affected Vehicles in order to evade federal and state vehicle emissions standards, the Individual Members engaged in racketeering acts under O.C.G.A. § 16-14-3(9)(A).

297. By compelling and/or condoning the installation of defeat devices in the Affected Vehicles in order to evade federal and state vehicle emissions standards, the Individual Members engaged in racketeering acts under O.C.G.A. § 16-14-3(9)(A) which were intended and targeted to deceive, mislead and/or induce reliance on false statements by Plaintiff Killebrew and the members of the Georgia Subclass, and those racketeering acts did directly and proximately caused, injuries and damages to Plaintiff Killebrew and the members of the Georgia Subclass.

298. By intentionally concealing and suppressing material facts concerning the quality and character of the Affected Vehicles the Individual Members engaged in racketeering acts under O.C.G.A. § 16-14-3(9)(A).

299. By intentionally concealing and suppressing material facts concerning the quality and character of the Affected Vehicles the Individual Members engaged in racketeering acts under O.C.G.A. § 16-14-3(9)(A) which were intended and targeted to deceive, mislead and/or induce reliance on false statements by Plaintiff Killebrew and the members of the Georgia Subclass, and those racketeering acts did directly and proximately caused, injuries and damages to Plaintiff Killebrew and the members of the Georgia Subclass.

300. The role of each member of the Clean Diesel RICO Enterprise is described below.

### Dr. Martin Winterkorn – CEO of Volkswagen AG

301. Dr. Martin Winterkorn succeeded Bernd Pischetsrieder as CEO of Volkswagen AG in 2007.

302.     In 2007, Volkswagen was struggling, specifically in the U.S. market, where Volkswagen's AG's performance was described as "disastrous":

> The brand's strategy of wooing customers with premium, uplevel products has not paid off; it is lacking new, interesting, and affordable products in key segments; and its costly production site in Chattanooga, Tennessee, is woefully underutilized.[47]

303.     Dr. Winterkorn was also facing a challenge to his leadership from auto magnate and long-time Volkswagen executive Ferdinand Piëch, who sought to oust Dr. Winterkorn as CEO.[48]

304.     In order to secure his leadership position, Dr. Winterkorn committed to an unprecedented gambit, described as:

> [a] plan to . . . triple [Volkswagen] sales in the United States in just a decade – setting it on a course to sweep by Toyota to become the world's largest automaker . . . by betting on diesel-powered cars. . . [and] promising high mileage and low emissions without sacrificing performance.[49]

305.     Dr. Winterkorn's promise to make Volkswagen the "world's largest seller of diesel-powered cars" secured his position as CEO and Piëch was ousted from the organization by Volkswagen's Management Board.

306.     However, as is now clear, Dr. Winterkorn's promise to the Board to overtake Toyota in the American market through the development of low- emission, consumer-friendly diesel passenger vehicles, while favorable to the investor's bottom line was—absent extraordinary breakthroughs in engineering—a practical impossibility. In short, Dr. Winterkorn overpromised.

---

[47] Anton Watts, "VW Drama: Why Piech Wants Winterkorn Out—and What the Future May Hold," *Car and Driver* (Apr. 16, 2015).
[48] *Id.*

[49] Danny Hakim, Aaron Kessler, and Jack Ewing, "As Volkswagen Pushed to Be No. 1, Ambitions Fueled a Scandal," *New York Times* (Sept. 26, 2015).

307.    Prior to 2007, when Dr. Winterkorn became CEO, in order to reduce emissions from diesel fuel, Volkswagen's diesel-powered vehicles, were equipped with BlueTEC, a selective catalytic reduction (SCR) system that Volkswagen leased from Daimler AG. To function, BlueTEC requires vehicles to carry an onboard tank of urea crystals in mineralized water, a feature which adds to the initial purchase price of the vehicle, and that must be refilled every 10,000 miles at a cost of around $300, which reduces any cost-savings a consumer might realize by using diesel instead of gasoline.

308.    In 2007, the year that Dr. Winterkorn took over as CEO, Volkswagen took two major steps to reverse this trend. First, Volkswagen ceased the use of BlueTEC in several of its models—in favor of developing its own emissions- reduction technology, which is now known to rely on the defeat devices which are the subject of this suit. Second, two executives of Volkswagen AG subsidiaries, Mr. Hackenberg  and Mr. Hatz, were given leadership roles at Volkswagen

309.    Mr. Hatz and Mr. Hackenberg were reportedly hand-picked to play a major role in implementing Dr. Winterkorn's plan to make Volkswagen the world's number- one automaker, through the development of consumer-friendly, low-emission diesel vehicles..

310.    By implementing these steps and, in turn, economically benefitting from the Clean Diesel RICO Enterprise, Dr. Winterkorn delivered on his promise to sell more diesel cars in the U.S. than every other brand combined. However, Dr. Winterkorn's misdeeds came at a price and he was forced to resign in September 2015, following allegations that he knew or should have known of the defeat devices installed in Volkswagen vehicles.

311.    Upon stepping down, Dr. Winterkorn asserted he was unaware of any wrong doing. However, that assertion is belied by newly-disclosed information that Volkswagen engineers discovered the use of the defeat device in 2011 and brought it, and the fact that the device was

illegal, to the attention of company management. Volkswagen apparently ignored that report and continued their fraudulent and deceptive practices.

312.    In their leadership positions within Volkswagen, the Individual Members ordered the development of and/or personally developed each of the affected diesel-vehicle models that are the subject of this suit. Also in those positions, each Individual Member had access to and authority over the engine development and technical details of each affected Volkswagen vehicle that is the subject of this suit.

### Ulrich Hackenberg

313.    Mr. Hackenberg joined Audi AG in 1989 and was put in charge of Audi Concept Definition. Later, he took over technical project management for Audi's entire product range, including the Audi A3, one of the affected vehicle models.[50]

314.    On February 1, 2007, Mr. Hackenberg was appointed as a Member of Volkswagen's Brand Board of Development, where he was responsible for the technical development of all the Volkswagen Group's brands.[51]   Under his leadership, three new models were developed: the Golf, the Polo, and the Passat, two of which are affected vehicle models.

315.    On July 1, 2013, Mr. Hackenberg was appointed to the Board of Management of Audi AG, and given the responsibility to head up Audi AG's Technical Development.

---

[50] Audi, "Board of Management," http://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-hackenberg, (last accessed Sept 26, 2015) ("In 1985 Prof. Dr. Hackenberg joined AUDI AG, where in 1989 he was put in charge of Concept Definition and later took over the technical project management of the entire product range. This included the models Audi 80, A3, A4, A6, A8, TT and A2."); Autoblog, "Hackenberg says next Audi A4 set for Frankfurt debut," (Mar. 10, 2015).

[51] Audi, "Board of Management," http://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-hackenberg, (last accessed Sept. 26, 2015).

316.     As head of technical development at Audi AG, Mr. Hackenberg spearheaded the development of Audi's TDI "Clean Diesel" engines. As he explained in a press release, his strategy for Audi's technical development included the following:

> P]ushing forward with development in . . . our TDI engines in the USA – our clean diesel offensive is bearing substantial fruit. In China, too, we are already introducing the first clean diesel models and watching developments there very closely. We also expect a great deal from g-tron technology, the most sustainable type of gas drive.[52]

317.     In his role as head of technical development at Audi AG, Mr. Hackenberg had extensive knowledge of the technical details of the TDI "Clean Diesel" models that he developed, and was reportedly suspended after reports that he had knowledge that the Affected Vehicles used defeat devices to evade federal and state vehicle emissions standards.

## Wolfgang Hatz

318.     Wolfgang Hatz joined Volkswagen in 2001 and at various times directed engine development for the Porsche, Audi, and Volkswagen brands.

319.     In his role as the head of Engines and Transmissions Development, Mr. Hatz supervised the development of the engines and transmissions for the Affected Vehicles and had knowledge of the technical details of each those vehicles.

320.     Mr. Hatz was reportedly suspended from his position in September 2015 after reports that he had knowledge that the affected Audi and Volkswagen vehicles used defeat devices to evade federal and state vehicle emissions standards.

## Allegations Common to the Individual Members

---

[52] Audi AG, "Gentlemen Start Your Engines," http://audi- encounter.com/magazine/technology/01-2015/126-gentlemen-start-your-engines (2014).

321.    Upon information and belief, in their leadership roles at Volkswagen, the Individual Members used Volkswagen AG and its subsidiaries including Volkswagen of America Inc., Volkswagen's resources, as well as supplier Bosch, to orchestrate a scheme to fulfill Dr. Winterkorn's promise to the Board to triple Volkswagen's sales in the United States through the sale of low-emission diesel vehicles by ordering, developing, and/or installing defeat devices in the Affected Vehicles and, through a pattern of racketeering activity, misrepresenting and/or concealing the true emissions levels of those vehicles.

322.    In addition to the pattern of racketeering detailed herein, the Individual Members exploited Volkswagen's, its subsidiaries', and Bosch's resources, including employees and engineers, in order to further the cover-up. For example, according to reports from "[e]missions testers at the company's site in Westlake Village, California [which] evaluated all [Volkswagen] cars," VW and Audi executives orchestrated a cover-up from abroad:

> …any vehicle failed to meet emissions targets, a team of engineers from Volkswagen headquarters [in Wolfsburg, Germany] or luxury brand Audi's base in Ingolstadt [Germany] was flown in…. After the group had tinkered with the vehicle for about a week, the car would then pass the test. VW had no engineers in the U.S. able to create the mechanism that cheated on the test or who could fix emissions problems, according to two other people.[53]

323.    In other words, any vehicles that failed emissions targets received special treatment—that is, was fitted with a defeat device—and then the vehicle would pass the emissions test.

324.    In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere.

---

[53] *See* Washington Post, "Volkswagen Said to Manage Faked Test Results From Germany," by Alex Webb and David Welch, September 25, 2015, available at http://washpost.bloomberg.com/Story?docId=1376-NV7XKY6S972S01-070HVM2I0AE9U5AUL6PH7OJ0E1 (last accessed October 8, 2015).

325.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

326.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

327.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

328.     In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby directly and/or indirectly acquiring and/or maintaining an interest in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

329.     In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

330.     In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere,

thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

331.   In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby directly and/or indirectly acquiring and/or maintaining an interest in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

332.   In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

333.   In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

334.   In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby directly and/or indirectly acquiring and/or maintaining an interest in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

335.   In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere,

thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

336.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

337.    In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of O.C.G.A. § 16-14-4(a).

338.    In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

339.    In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

340.    In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere,

thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

341.     In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

342.     In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

343.     In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

344.     In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to distribute Affected Vehicles to the United States and elsewhere, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

345.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers.

346.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

347.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

348.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

349.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including

money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation, in violation of O.C.G.A. § 16-14-4(a).

350.     In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

351.     In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

352.     In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

353.     In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or

conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

354. In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation, in violation of O.C.G.A. § 16-14-4(a).

355. In his leadership role at Volkswagen AG and its subsidiaries, Dr. Winterkorn used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

356. In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

357. In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conducting

or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

358.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

359.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation, in violation of O.C.G.A. § 16-14-4(a).

360.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hackenberg used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

361.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly

and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

362.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

363.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

364.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation, in violation of O.C.G.A. § 16-14-4(a).

365.    In his leadership role at Volkswagen AG and its subsidiaries, Mr. Hatz used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money,

from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

366.    In their leadership roles at Volkswagen AG and its subsidiaries, the Individual Members used Volkswagen's infrastructure to orchestrate, and/or approve, a marketing campaign designed to misrepresent the emission levels of affected vehicles and defraud consumers, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

367.    As a result of the Individual Members' misuse of Volkswagen resources and infrastructure, they achieved considerable personal and financial success.

## Allegations Against the Volkswagen Corporate Members

368.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below.

369.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below.

370.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers, thereby engaging in racketeering activity under O.C.G.A. §16-14-3(9)(A).

371.    Volkswagen AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers, thereby engaging in racketeering activity under O.C.G.A. §16-14-3(9)(A).

372.    Audi AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers, thereby engaging in racketeering activity under O.C.G.A. §16-14-3(9)(A).

373.    Defendant Volkswagen of American, Inc. developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers, thereby engaging in racketeering activity under O.C.G.A. §16-14-3(9)(A).

374.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

375.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

376.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

377.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation, in violation of O.C.G.A. § 16-14-4(a).

378.    The Volkswagen Corporate Members developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

379.    Volkswagen AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

380.    Volkswagen AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

381.    Volkswagen AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conspiring and/or endeavoring to acquire

and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

382. Volkswagen AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation, in violation of O.C.G.A. § 16-14-4(a).

383. Volkswagen AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

384. Audi AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

385. Audi AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conducting or participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

386. Audi AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the

racketeering activity described below, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

387.   Audi AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation, in violation of O.C.G.A. § 16-14-4(a).

388.   Audi AG developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

389.   Defendant Volkswagen of America, Inc. developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

390.   Defendant Volkswagen of America, Inc. developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conducting or

participating in, directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

391.    Defendant Volkswagen of America, Inc.  developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conspiring and/or endeavoring to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

392.    Defendant Volkswagen of America, Inc. developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation, in violation of O.C.G.A. § 16-14-4(a).

393.    Defendant Volkswagen of America, Inc.  developed, conducted, and approved a marketing campaign designed to misrepresent the emission levels of affected vehicles and to defraud consumers based upon the racketeering activity described below, thereby conspiring and/or endeavoring to acquire and/or maintain interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

394.    The Volkswagen Corporate Members collaborated and colluded with each other with and the Individual Members to conceal and suppress material facts concerning the quality

and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants.

395.    The Volkswagen Corporate Members collaborated and colluded with each other with and the Individual Members to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants, thereby engaging in racketeering activity under O.C.G.A. §16-14-3(9)(A).

396.    The Volkswagen Corporate Members collaborated and colluded with each other with and the Individual Members to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

397.    The Volkswagen Corporate Members collaborated and colluded with each other with and the Individual Members to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

398.    Volkswagen AG collaborated and colluded with Defendant Volkswagen of America, Inc. and Audi AG, and with and the Dr. Winterkorn, Mr. Hackenberg and Mr. Hatz, to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to

conceal its vehicles' emissions of the pollutants, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

399.    Volkswagen AG collaborated and colluded with Defendant Volkswagen of America, Inc. and Audi AG, and with Dr. Winterkorn, Mr. Hackenberg and Mr. Hatz, to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

400.    Audi AG collaborated and colluded with Defendant Volkswagen of America, Inc. and Volkswagen AG, and with and the Dr. Winterkorn, Mr. Hackenberg and Mr. Hatz, to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

401.    Audi AG collaborated and colluded with Defendant Volkswagen of America, Inc. and Volkswagen AG, and with and the Dr. Winterkorn, Mr. Hackenberg and Mr. Hatz, to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

402.   Defendant Volkswagen of America, Inc. collaborated and colluded with Volkswagen AG and Audi AG, and with Dr. Winterkorn, Mr. Hackenberg and Mr. Hatz, to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants, thereby directly and/or indirectly acquiring and/or maintaining interests in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

403.   Defendant Volkswagen of America, Inc. collaborated and colluded with Volkswagen AG and Audi AG,  and with Dr. Winterkorn, Mr. Hackenberg and Mr. Hatz, to conceal and suppress material facts concerning the quality and character of the affected vehicles and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutants, thereby directly and/or indirectly acquiring and/or maintaining interests in personal property, including money, in violation of O.C.G.A. § 16-14-4(a).

**Allegations Against Robert Bosch GmbH ("Bosch")**

404.   On information and belief, Bosch developed the engine and emissions control systems and software that provided the basis for the defeat devices, and sold them to Volkswagen.

405.   On information and belief, Bosch was aware that the use of "test" or "dynometer" operation modes programmed into engine management software as defeat devices to evade emissions requirements is illegal in the United States, but nevertheless sold the systems and software to Volkswagen AG.

406.   In 2007, when Volkswagen was developing the TDI engines that are the subject of the present suit using Bosch engine management software, Bosch issued a letter to the Volkswagen

AG warning them that the use of "test" or "dynometer" modes included in the software during normal operation of a vehicle was illegal.

407.    Bosch was reckless in not being aware of Dr. Winterkorn's promise ambitions to the Board to overtake Toyota's sales in the American market and to become the largest auto manufacturer in the world, through the sale of low- emission diesel passenger vehicles.

408.    Bosch was reckless in not being aware that the illegal use of its software as a defeat device would help to achieve Dr. Winterkorn's promise.

409.    Bosch was or should have been further aware that sales of Volkswagen vehicles that had Defeat Devices installed were increasing at an unprecedented rate.

410.     Based upon the above-alleged pieces of information Bosch, as one of the largest and most successful component manufacturers in the world, knew or should have known, or was recklessly in not knowing, that engine management systems and software were being used as part of defeat devices illegally used in Volkswagen vehicles sold in the United States and around the world.

411.    Based upon the above-alleged pieces of information, Bosch directly and/or indirectly acquired and/or maintained an interest in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(a).

412.    Based upon the above-alleged pieces of information, Bosch directly or indirectly, the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(b).

413.    Based upon the above-alleged pieces of information, Bosch directly or indirectly and/or endeavored to acquire and/or maintain interests in the Clean Diesel RICO Enterprise and/or conspiring and/or endeavoring to conduct or participate, directly or indirectly, in the Clean Diesel RICO Enterprise in violation of O.C.G.A. § 16-14-4(c).

414.     Based upon the above-alleged pieces of information, Bosch directly and/or indirectly acquired and/or maintained interests in personal property, including money, from Plaintiff Killebrew and the members of the Georgia Subclass, in violation of § O.C.G.A. § 16-14-4(c).

## Enterprise Allegations

415.     Defendant Volkswagen is a "person" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-1 *et seq.*

416.     Volkswagen AG is a "person" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-1 *et seq.*

417.     Audi AG is a "person" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-1 *et seq.*

418.     Dr. Winterkorn is a "person" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-1 *et seq.*

419.     Mr. Hatz is a "person" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-1 *et seq.*

420.     Mr. Hackenberg is a "person" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-1 *et seq.*

421.     Bosch is a "person" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-1 *et seq.*

422.     Defendant Volkswagen is an "enterprise" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-3(6).

423.     Volkswagen AG is an "enterprise" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-3(6).

424.     Audi AG is an "enterprise" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-3(6).

425.     Bosch is an "enterprise" within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-3(6).

426.     The Clean Diesel RICO Enterprise is an "enterprise" as defined under O.C.G.A §16-14-3(6) and consists of persons, corporations and other legal entities associated together for licit and illicit activities, including employing the multiple, deceptive, abusive, illegal, and/or fraudulent acts described herein.

427.     Defendant Volkswagen is associated with Volkswagen AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

428.     Defendant Volkswagen is associated with Audi AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

429.     Defendant Volkswagen is associated with Bosch within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

430.      Defendant Volkswagen is associated with the Clean Diesel RICO Enterprise within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b)

431.     Volkswagen AG is associated with Defendant Volkswagen within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

432.     Volkswagen AG is associated with Audi AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

433.     Volkswagen AG is associated with Bosch within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

434.   Volkswagen AG is associated with the Clean Diesel RICO Enterprise within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

435.   Audi AG is associated with Defendant Volkswagen within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

436.   Audi AG is associated with Volkswagen AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

437.   Audi AG is associated with Bosch within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

438.   Audi AG is associated with the Clean Diesel RICO Enterprise within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

439.   At all times relevant Dr. Winterkorn was employed by or associated with Defendant Volkswagen within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

440.   At all times relevant Dr. Winterkorn was employed by or associated with Volkswagen AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

441.   At all times relevant Dr. Winterkorn was employed by or associated with Audi AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

442.   At all times relevant Dr. Winterkorn was employed by or associated with the Clean Diesel RICO Enterprise within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

443.   At all times relevant Mr. Hatz was employed by or associated with Defendant Volkswagen within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

444.   At all times relevant Mr. Hatz was employed by or associated with Volkswagen AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

445.    At all times relevant Mr. Hatz was employed by or associated with Audi AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

446.    At all times relevant Mr. Hatz was employed by or associated with the Clean Diesel RICO Enterprise within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

447.    At all times relevant Mr. Hackenberg was employed by or associated with Defendant Volkswagen within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

448.    At all times relevant Mr. Hackenberg was employed by or associated with Volkswagen AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

449.    At all times relevant Mr. Hackenberg was employed by or associated with Audi AG within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

450.    At all times relevant Mr. Hackenberg employed by or associated with the Clean Diesel RICO Enterprise within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).

451.    Bosch is associated with the Clean Diesel RICO Enterprise within the meaning of the Georgia RICO Act, O.C.G.A. §16-14-4(b).14-1 *et seq.*

452.    The Clean Diesel RICO Enterprise was formed in or about 2007 and continues to the present day.

453.    On information and belief, the Individual Members and the Volkswagen Corporate Members, violated O.C.G.A.§ 16-14-4(a) by participating in or conducting the affairs of the Clean Diesel RICO Enterprise and/or engaging in a pattern of repeatedly defrauding consumers.

454.    In addition, Bosch violated O.C.G.A.§ 16-14-4(a) by participating in or conducting the affairs of the Clean Diesel RICO Enterprise through a pattern that it knew or should have known defrauded consumers.

455.    The Enterprise undertook a fraudulent scheme to sell Affected Vehicles based upon the false and misleading misrepresentations and omissions set forth herein.

456.    In furtherance of the scheme, the Volkswagen Corporate Members and/or Individual Members engaged in thousands of acts of mail fraud and wire fraud in repeated violation, or attempted violation of 18 U.S.C. §1341, each of which constitute "racketeering activity," as that term is defined in O.C.G.A. 16-14-5(9)(A).

457.    The Clean Diesel RICO Enterprise is an ongoing organization with an ascertainable structure and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Enterprise members have engaged and are engaging. Each member of the Enterprise performs a role in furtherance of the scheme consistent with its structure. The Enterprise was controlled by the Volkswagen Corporate Members and/or the Individual Members who developed the defeat device scheme and developed the cars and engines that would put it into place. Upon direction from the Volkswagen Corporate Members and/or Individual Members, Bosch knew was reckless in not knowing the illegal purpose for which the defeat devices software it developed and supplied to the Volkswagen Corporate Members was being used, and the Volkswagen Corporate Members distributed the vehicles alongside a marketing campaign designed to misrepresent the Affected Vehicles' emission levels and defraud consumers.

458.    The Enterprise also exists for the legitimate purpose of developing, manufacturing, and selling automobiles and operates within a framework that includes the sale of other automobiles not affected by fraud.

459.    Alternatively, the Enterprise was formed solely for the purpose of carrying out the pattern of racketeering acts described herein.

460.    The Enterprise was and is used by the Individual Members and/or the Volkswagen Corporate Members to effectuate a pattern of racketeering activity. All members of the Clean Diesel RICO Enterprise played a part in a fraudulent scheme to sell affected vehicles through the use of false or misleading statements related to the power, fuel efficiency, and emissions levels of the Affected Vehicles.

461.    The members of the Enterprise shared a common purpose to develop and sell vehicles, of which certain models included a functioning defeat device.

462.    On information and belief, the Volkswagen Corporate Members and Individual Members of the Enterprise also shared a common purpose which amounted to fraud: to misrepresent the emission levels, fuel efficiency, performance, and power of affected Volkswagen vehicles and/or to conceal information regarding the use of defeat devices in the Affected Vehicles to evade state and federal emission regulations. Bosch knew or was reckless in not knowing that this was occurring and that Bosch software was being used to achieve it.

463.    Each member of the Enterprise benefits from the common purpose. For the Volkswagen Corporate Members, the purpose was to avoid the additional costs associated with developing and installing low-emissions diesel technology that would also be attractive to consumers, and to sell and lease more vehicles to consumers based upon false representations of the Affected Vehicles' performance and emissions levels. Succinctly put, the common purpose was to profit from the myth of the "holy grail" of high performance, efficient, low emissions vehicles. For the Individual Members, the purpose of the scheme was to further their own professional and pecuniary interests through misuse of the Corporate Members' resources. For Bosch, the purpose was to increase the sales of components to Volkswagen and thus realize monetary profit from the scheme.

464. The Clean Diesel RICO Enterprise is separate and distinct from the pattern of racketeering activity. The Enterprise was an ongoing organization or group and existed to advance the interests of the individual entities that comprise its membership, as noted above.

465. Volkswagen AG and its subsidiaries, Volkswagen Group America, Inc. and Audi AG; Bosch; Martin Winterkorn, Ulrich Hackenberg, and Wolfgang Hatz are entities separate and distinct from one another and from the Enterprise. All of the Enterprise members are independent legal entities with the authority to act independently of the Enterprise and the other Enterprise members.

466. The Individual Members, the Volkswagen Corporate Members, and Bosch, and their respective officers and employees, together, knowingly or recklessly, developed the defeat devices and the Affected Vehicles and/or the operative technology in the Affected Vehicles.

467. The Individual Members, the Volkswagen Corporate Members, and their respective officers and employees developed the false, misleading and/or deceptive advertisements described above.

## Pattern of Racketeering Activity

468. As set forth above, the Volkswagen Corporate Members and the Individual Members conducted and participated in the affairs of the Clean Diesel RICO Enterprise.

469. In furtherance of the scheme, the Volkswagen Corporate Members engaged in thousands, or more, acts of mail fraud and wire fraud, each of which constitute "racketeering activity," as the term is defined in O.C.G.A. 16-14-5(9)(A).

470. Specifically, the pattern consisted of numerous and repeated violations of the federal mail and wire fraud statutes—namely 18 U.S.C. §§ 1341 and 1343—that prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud.

471.    This pattern of activities likewise violates O.C.G.A. §16-10-20, which prohibits the knowing and willful falsification or concealment of material facts as well the making of false, fictitious, or fraudulent statement, representation writings.

472.    In December, 2014, in response to concerns raised by the California Air Resources Board and the EPA, Volkswagen was permitted to issue recall letters for certain 2-liter diesel 2010-2014 models. The letters, sent to owners and lessees of certain Affected Vehicles needed to return their cars in order to install a software update that would fix an issue with a malfunctioning indicator light.

473.    In or about April, 2015, Volkswagen sent letters to owners and lessees of Affected Vehicles as part Emissions Service Action 2306, which were sent through the United States Mail, instructing them to take their cars to a dealer in order to install a software update that would alter their vehicles' tailpipe emissions so as to "optimize . . . operating efficiency." In reality, the software update was intended only to continue to evade state emissions tests and the letter was intended to (and did) perpetrate fraud against consumers and government regulators.

474.    Specifically, it indicated that "if the [light] illuminates for any reason, your vehicle will not pass an . . . emission inspection."[54]   In reality, the update was intended only to evade state emission tests and the letter was intended to perpetrate fraud against consumers and government regulators.

475.    As detailed above, Volkswagen has continuously and, as recently as September 17, 2015, in television, internet and print advertisements, falsely represented that its Affected Vehicles were "clean diesel" vehicles, which emitted less greenhouse gas than other

---

[54] Mike Blake, "Exclusive: VW recall letters in April warned of an emissions glitch," *Reuters Business* (Sept. 23, 2015).

models, when in fact they emitted 10 to 40 times more greenhouse gases than legally permitted by state and federal regulations.

476.    In addition to the foregoing, each download or view of one of the advertisements described above constituted a separate offense.

477.    Continually, and as recently as September 17, 2015, Volkswagen transmitted fraudulent reports to the EPA indicating that their Affected Vehicles met emissions targets as required by law,[55] when in fact they emit 10 to 40 times more greenhouse gases than permitted by state and federal regulation.

478.    The Volkswagen Corporate Members and/or Individual Members, with the assistance and collaboration of the other persons associated in fact with the Enterprise, devised and employed a fraudulent scheme to suppress and conceal the true emissions levels of the affected vehicles and by use of the mails, telephone and internet transmitted, or caused to be transmitted, by means of wire communication traveling in interstate or foreign commerce, writing(s) and/or signal(s), including but not limited to Volkswagen and Audi's websites, Service Bulletins to dealers, vehicle owners' manuals, press releases, advertisements, communications with federal and state regulators, and communications with other members of the enterprise, for the purpose of executing that scheme or artifice to defraud. This pattern of conduct is exemplified below.

479.    To the extent that any of the Volkswagen Corporate Members did not participate directly in these acts of mail fraud, they knowingly and willfully caused, aided, abetted, advised, encouraged, hired, counseled, commanded, induced or procured another to commit these violations of 18 U.S.C. § 1341 and in violation of O.C.G.A. § 16-2-20.

---

[55] *See* Washington Post, "Volkswagen Said to Manage Faked Test Results From Germany," by Alex Webb and David Welch, September 25, 2015, available at http://washpost.bloomberg.com/Story?docId=1376-NV7XKY6S972S01-070HVM2I0AE9U5AUL6PH7OJ0E1 (last accessed October 8, 2015).

480.     Volkswagen Corporate Members, and their officers, agents, and employees, as well as the Individual Members could reasonably foresee the uses of the United States Postal Service and interstate couriers in connection with the execution of Clean Diesel RICO Enterprise All of these acts constitute "intangible contacts" with the State of Georgia designed to further all of the violations alleged in this Complaint.  In this regard, the Volkswagen Corporate Members, to include Defendant Volkswagen, have purposely directed tortious and fraudulent conduct toward the State of Georgia and to Plaintiff Killebrew and the members of the Georgia Subclass..

481.     Each of these "mailings" constitutes a separate racketeering act in furtherance of the fraudulent schemes which constitute a pattern of "racketeering activity" under Georgia RICO as specified in O.C.G.A. §§  16-14-3(4)(A) and (5)(C).

482.     Each of these acts of racketeering activity was authorized, requested, commanded, performed, or recklessly tolerated by the Volkswagen Corporate Members and the Individual Members and was done in furtherance of the execution of the Clean Diesel Rico Enterprise.

483.     Upon information and belief each of these acts of racketeering was activity recklessly tolerated and/or accepted, and/or willfully and recklessly ignored, by Bosch in furtherance of the execution of the Clean Diesel Rico Enterprise.

484.      The multiple acts of racketeering activity by the members of the Clean Diesel RICO Enterprise were interrelated, were and are part of a common and continuous pattern of racketeering activity to include fraudulent acts and schemes, which were and are acts perpetrated for the same or similar purposes, and were and are not a series of disconnected, isolated or sporadic acts.  These acts were and are part of the regular and routine way the Volkswagen Corporate Members, the Individual Members, and Bosch conducted and conduct their business.  The multiple racketeering acts by the Volkswagen Corporate Members, the Individual Members, and Bosch and

employees constitute a "pattern of racketeering activity" as defined in O.C.G.A. § 16-14-3(4)(A) and (5).

### Injuries and Damage Sustained by the Plaintiff and the Georgia Subclass

485.   As a direct result of the foregoing violations of O.C.G.A. §16-14-4(a), Plaintiff  Killebrew and the members of the Georgia Subclass have been directly and proximately injured in their business and/or property by reason of the Clean Diesel RICO Enterprise's conduct in at least the following ways:

(1) Plaintiff and Class members who purchased or leased Affected Vehicles were fraudulently induced into making those transactions and/or paying more than they otherwise would have had the true emissions and performance information of the Affected Vehicles been revealed; and

(2) The value of the vehicles Plaintiff and Class members purchased has been reduced, and if they can resell their vehicles at all, the resale value has decreased dramatically.

486.   But for the predicate acts described above—including the numerous false and misleading statements (and marketing and advertising containing omissions) sent via the U.S. mail and interstate wires—Plaintiff and Class Members would not have paid as high a price for the Affected Vehicles as they did, or would not have purchased the Affected Vehicles at all.

487.   By reason of the foregoing, Defendant Volkswagen, has unlawfully, knowingly, and willfully conducted and participated directly or indirectly in the foregoing Clean Diesel RICO Enterprise through a pattern of racketeering activity in violation or attempted violation of O.C.G.A. § 16-14-4(a) and in doing so directly and proximately caused injuries and damages to Plaintiff Killebrew and to the members of the Georgia Subclass.

488.   These violations of O.C.G.A. §§ 16-14-4(a), 16-14-4(b) and 16-14-4(c) by Defendant Volkswagen have directly and proximately caused Plaintiff Killebrew's and the Georgia Subclass members' injuries and damages as set forth above.

489.    Plaintiff Killebrew and Georgia Subclass members' are entitled to compensatory damages, treble damages, punitive damages, attorney's fees, costs of investigation and litigation and interest, if applicable, pursuant to O.C.G.A. § 16-14-6(c), as well as all such other relief the Court and jury deem proper, including but not limited to, any remedies specified in O.C.G.A § 16-14-6(1)-(5).

## COUNT VII
## BREACH OF CONTRACT UNDER GEORGIA LAW
### (Brought on Behalf of the Georgia Subclass)

490.    Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

491.    Plaintiff Killebrew brings this claim individually and on behalf of the proposed Georgia Subclass.

492.    Volkswagen's misrepresentations and omissions alleged herein, including its failure to disclose the existence of the Clean Diesel engine system's defect and/or defective design as alleged herein, caused Plaintiff Killebrew and the other Georgia Subclass members to make their purchases or leases of their Affected Vehicles.

493.    Absent those misrepresentations and omissions, Plaintiff Killebrew and the other Georgia Subclass members would not have purchased or leased these Affected Vehicles, would not have purchased or leased these Affected Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the Clean Diesel engine system and which were not marketed as including such a system. Accordingly, Plaintiff Killebrew and the other Georgia Subclass members overpaid for their Affected Vehicles and did not receive the benefit of their bargain.

494.     Each and every sale or lease of an Affected Vehicle by an authorized Volkswagen dealer constitutes a contract between Volkswagen and the purchaser or lessee. Volkswagen breached these contracts by selling or leasing Plaintiff Killebrew and the other Georgia Subclass members defective Affected Vehicles and by misrepresenting or failing to disclose the existence of the Clean Diesel engine system's defect and/or defective design, including information known to Volkswagen rendering each Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a Clean Diesel engine system.

495.     As a direct and proximate result of Volkswagen's breach of contract, Plaintiff Killebrew and the other Georgia Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VIII
## VIOLATION OF THE GEORGIA DECEPTIVE TRADE PRACTICES ACT
### (O.C.G.A. § 10-1-370 *ET SEQ*).
### (Brought on Behalf of the Georgia Subclass)

496.     Plaintiff re-alleges and incorporates by reference all above paragraphs as though fully set forth herein.

497.     Plaintiff Killebrew brings this claim individually and on behalf of the Georgia Subclass.

498.     The Georgia Deceptive Trade Practice Act ("Georgia DPTA") provides that a person "engages in a deceptive trade practice when, in the course of his business, vocation, or occupation" where a person's actions "…[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;" where a person "[r]epresents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status,

affiliation, or connection that he does not have;" where a person "[r]epresents that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;" or where a person "[a]dvertises goods or services with intent not to sell them as advertised." O.C.G.A. §10-7-372(a).

499. Volkswagen participated in misleading, false, or deceptive acts that violated the Georgia DPTA. By fraudulently installing the "defeat device" to make it appear that the Clean Diesel engine systems complied with EPA regulations, Volkswagen engaged in deceptive business practices prohibited by the Georgia DPTA.

500. Volkswagen actions as set forth above occurred in the conduct its trade or business.

501. In the course of its business, Volkswagen installed the "defeat device" and concealed that its Clean Diesel systems failed EPA regulations as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

502. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles despite the fact that Volkswagen has known of its use of the "defeat device" and the true nature of its Clean Diesel engine system for at least six years, but concealed all of that information until recently.

503. Volkswagen was also aware that they valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations. Volkswagen concealed this information as well.

504.    By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the Clean Diesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in unfair and deceptive business practices in violation of the Georgia DPTA.

505.    In the course of Volkswagen's business operations, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the Clean Diesel engine system and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

506.    Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Killebrew, about the true cleanliness and efficiency of the Clean Diesel engine system, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Affected Vehicles.

507.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with intent to mislead Plaintiff Killebrew and the Georgia Subclass.

508.    Volkswagen knew or should have known that its conduct violated the Georgia DPTA.

509. As alleged above, Volkswagen made material statements about the safety, cleanliness, efficiency and reliability of the Affected Vehicles and the Volkswagen and Audi brands that were either false or misleading.

510. Volkswagen owed Plaintiff Killebrew and the Georgia Subclass a duty to disclose the true safety, cleanliness, efficiency and reliability of the Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because they:

(1) Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

(2) Intentionally concealed the foregoing from Plaintiff Killebrew and the Georgia Subclass; and/or

(3) Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Affected Vehicles generally, and the use of the "defeat device" and true nature of the Clean Diesel engine system in particular, while purposefully withholding material facts from P Plaintiff Killebrew and the Georgia Subclass that contradicted these representations.

511. Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the Clean Diesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the Clean Diesel engine system finally began to be disclosed, the value of the Affected Vehicles has greatly diminished. In light of the stigma attached to those vehicles by the Volkswagen Defendants' conduct, they are now worth significantly less than they otherwise would be.

512. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the Clean Diesel engine system were material to P Plaintiff Killebrew and the Georgia Subclass. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable and dishonest

manufacturer of polluting vehicles that conceals the amount its cars pollutes rather than make environmentally friendly vehicles.

513.    Plaintiff Killebrew and the Georgia Subclass suffered ascertainable loss caused by the Volkswagen Defendants misrepresentations' and their concealment of and failure to disclose material information. Class members who purchased the Affected Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all.

514.    Volkswagen had an ongoing duty to all Volkswagen and Audi customers to refrain from unfair and deceptive acts or practices under the Georgia DPTA. All owners of Affected Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Volkswagen's deceptive and unfair acts and practices made in the course of Volkswagen's business.

515.    Pursuant to O.C.G.A. §10-1-374, Plaintiff Killebrew and the Georgia Subclass seek injunctive relief against Volkswagen's deceptive trade practices, costs, attorneys' fees, and any other just and proper relief available under the Georgia DPTA.

## COUNT IX
## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICE ACT
### (O.C.G.A. § 10-1-390 ET SEQ).
### (Brought on Behalf of the Georgia Subclass)

516.    Plaintiff re-alleges and incorporates by reference all paragraphs as though fully set forth herein.

517.    Plaintiff Killebrew will bring this claim individually and on behalf of the proposed Georgia Subclass.

518.    Plaintiff intends to assert a claim under the Georgia Fair Business Practice Act which makes it unlawful to engage in any unfair or deceptive practices in the conduct of any trade

or commerce in part or wholly in the state." O.C.G.A. § 10-1-391(a). Plaintiff Killebrew will make a demand individually and on behalf of the proposed Georgia Subclass in satisfaction of O.C.G.A. 10-1-399 and may amend this Complaint to assert claims under the Georgia Fair Business Practice Act once the required 30 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Georgia Fair Business Practice Act.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Nationwide Class and the Georgia Subclass, respectfully requests that the Court enter judgment in her favor and against Volkswagen, as follows:

A.    an order certifying the proposed Nationwide Class, designating Plaintiff Killebrew as the named representatives of the Nationwide Class, and designating the undersigned as Class Counsel;

B.    an order certifying the proposed Georgia Subclass, designating Plaintiff Killebrew as the named representative of the Georgia Subclass, and designating the undersigned as Class Counsel;

C.    a declaration that Volkswagen is financially responsible for notifying all Class Members about the true nature of the Affected Vehicles;

D.    an order enjoining Volkswagen to desist from further deceptive distribution, sales, and lease practices with respect to the Affected Vehicles, and directing Volkswagen to permanently, expeditiously, and completely repair the Affected Vehicles;

E.    an order compelling Volkswagen to buy back the Affected Vehicles on fair and equitable terms;

F.      an award to Plaintiff and Class Members of compensatory, exemplary, punitive, and statutory penalties and damages, including interest, in an amount to be proven at trial;

G.      an award to Plaintiff and Class Members for the return of the purchase prices of the Affected Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

H.      a declaration that Volkswagen must disgorge, for the benefit of Plaintiff Killebrew and Class Members, all or part of the ill-gotten profits received from the sale or lease of the Affected Vehicles, and make full restitution to Plaintiffs and Class Members;

I.      an award of treble damages to Plaintiff Killebrew and the Nationwide Class pursuant to 18 U.S.C. §§ 1964(a) and 1964(c);

J.      an award of punitive damages, injunctive and/or equitable relief, and her costs and reasonable attorneys' fees to the Plaintiff Killebrew pursuant to 18 U.S.C. § 1964(c).

K.      an award of compensatory damages to Plaintiff Killebrew and the Georgia Subclass members pursuant to O.C.G.A. § 16-14-6(c);

L.      an award of treble damages to Plaintiff Killebrew and Georgia Subclass members pursuant to O.C.G.A. § 16-14-6(c);

M.      an award of punitive damages to Plaintiff Killebrew and the Georgia Subclass members pursuant to O.C.G.A. § 16-14-6(c);

N.     Attorneys' fees, costs of investigation and litigation costs pursuant to O.C.G.A. § 16-14-6(c);

O.     All other proper relief specified in O.C.G.A § 16-14-6(1)-(5).

P.     an award of attorneys' fees and costs, as otherwise allowed by law;

Q.     an award of pre-judgment and post-judgment interest, as provided by law;

R.     leave to amend this Complaint to conform to the evidence produced at trial; and

S.     such other relief as may be appropriate under the circumstances.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.


DATED:  October 9, 2015

By:     /s/ Kevin R. Dean, Esq.
        Kevin R. Dean, Esq.
        Georgia Bar No. 214855
        Joseph F. Rice, Esq.
        (*pro hac vice motion to be filed*)
        Jodi Westbrook Flowers, Esq.
        (*pro hac vice motion to be filed*)

        **MOTLEY RICE, LLC**
        28 Bridgeside Boulevard
        Mount Pleasant, SC 29464
         (843) 216-9000
        jrice@motleyrice.com
        kdean@motleyrice.com
        jflowers@motleyrice.com

117